**GALAMET, INC., and Rig Industries, Inc., Appellants,**

v.

**DIRECTOR OF REVENUE, Respondent.**

No. 78064.

Supreme Court of Missouri,
En Banc.

Feb. 20, 1996.

**332**

William B. Prugh, Dean Kuckelman, Kansas City, for appellants.

Jeremiah W. (Jay) Nixon, Atty. Gen., Gretchen Garrison, Asst. Atty. Gen., Jefferson City, for respondent.

LIMBAUGH, Judge.

Galamet, Inc., and Rig Industries, Inc., ("Galamet") appeal two decisions by the Administrative Hearing Commission ("AHC"), one upholding an assessment against Galamet of unpaid sales tax on purchases of machinery and equipment and the other denying Galamet a refund of sales tax paid on purchases of electricity. Because this appeal involves the construction of revenue statutes, this Court has jurisdiction. Mo. Const. art. V, § 3. We reverse the decision upholding the assessment of unpaid sales tax and affirm the decision denying the refund of sales tax.

### I.

Galamet produces shredded steel for use by steel mills. For the production of this shredded steel, Galamet obtains useless scrap metal called "inputs." The inputs consist of automobile bodies, old pipes, "white goods" (e.g., refrigerators, water heaters) and other materials, which vary in size, shape, source, use, and metallurgical content and which are unsuitable for use by steel mills and foundries. Galamet's cranes and conveyors feed the inputs into a five-story mill, where the inputs are crushed and chopped into fist-size pieces by a series of bell-shaped hammers powered by a 2,500 horsepower electric motor. The resulting shreds are then sent through a system of cyclones and blowers to remove dirt, foam, and other nonmetal material called "fluff". Finally, Galamet uses a series of electromagnets to remove ferrous metal from the nonferrous. The end results are small pieces of steel, known in the industry as "shredded auto scrap," which meet industry requirements for size and metallurgical content. Steel mills and foundries may specify the requisite size and shape of the steel shreds necessary for their particular operation. The mills and foundries that purchase Galamet's steel shreds melt them down and use them to manufacture various steel products, such as grinding balls, steel pipe, tie rod bars, etc. In the marketplace, a ton of shredded auto scrap is worth about three times the value of a ton of inputs.

From October 1, 1989 through September 30, 1992, Galamet purchased machinery and equipment in order to expand its operations. To avoid paying sales tax on these transactions, Galamet presented its vendors with a certificate asserting that Galamet qualified for the manufacturing plant expansion exemption under § 144.030.2(5), RSMo. That statute exempts from sales tax purchases of machinery and equipment acquired to expand existing manufacturing operations. The Director of Revenue ("Director"), upon conducting a sales tax audit, determined that Galamet did not qualify for the exemption and assessed unpaid sales taxes, interest and additions totaling over $100,000.

Galamet also applied for an electrical energy direct pay authorization for the calendar year 1991 so that it could avoid paying sales tax to Kansas City Power & Light Company ("KCP & L") and instead report and remit sales tax on electricity purchases directly to the Director. The Director denied Galamet's application, determining that the total cost of electrical energy for Galamet's operation did not exceed 10% of its total cost of production, as required by § 144.030.2(12), RSMo. Therefore Galamet paid sales tax on all electricity purchases in 1991 directly to KCP & L.

Galamet challenged both of the Director's decisions, and the matters were consolidated for hearing before the AHC. With regard to the sales tax exemption on the machinery purchases, the AHC found that Galamet did not engage in "manufacturing" as contemplated by § 144.030.2(5) because the shredded steel was not a product intended to be sold ultimately for final use or consumption.

Therefore, Galamet did not qualify for the sales tax exemption.[1]

On the second claim, the AHC ruled that Galamet did qualify for the electrical energy direct pay authorization. However, no refund was ordered because the AHC determined that only KCP & L—the party that actually remitted the tax to the Director—had standing to claim a refund.

This Court will affirm the decisions of the AHC if they are authorized by law and supported by competent and substantial evidence upon the whole record. § 621.193, RSMo 1994.

## II.

■ For its first point, Galamet contends that it qualifies for the tax exemption under § 144.030.2(5) because it engages in manufacturing. The sales tax exemption is only allowed, however, if the machinery and equipment purchased "is used directly in manufacturing . . . a product which is intended to be sold ultimately for final use or consumption." *Id.* The contention that Galamet is not entitled to the exemption rests upon two separate grounds. One, as propounded by the Director in the briefs, is that Galamet does not engage in manufacturing as this Court has previously defined the term because Galamet does not produce a product substantially different from the input material. The other ground, on which the AHC based its decision, is that steel shreds are not "products . . . intended to be sold ultimately for final use or consumption," and hence, the production of steel shreds is not manufacturing.

### A.

We first address whether Galamet's operations constitute manufacturing as we have defined that term in previous cases. The meaning and application of the word "manufacturing" vary somewhat with the factual settings in which it is used. *L & R Egg Co. v. Director of Revenue,* 796 S.W.2d 624, 626 (Mo. banc 1990). This Court, in *West Lake Quarry & Material Co. v. Schaffner,* 451

S.W.2d 140 (Mo.1970), defined manufacturing by setting forth the following language from a Kentucky decision: "[I]f a process takes something practically unsuitable for any common use and changes it so as to adapt it to such common use, then such a process may be legally considered as manufacturing within the meaning of the tax exemption statutes." *Id.* at 143 (citing *City of Louisville v. Howard,* 306 Ky. 687, 208 S.W.2d 522, 527 (1947)). Two years later, this Court addressed the question again and determined that commercial printers that purchased printing presses were manufacturers of stationery products because they produced "new and different articles from raw materials" and made "products for sale which had an intrinsic and merchantable value, and were in forms suitable for new uses." *Heidelberg Central Inc. v. Director Dept. of Rev.,* 476 S.W.2d 502, 506 (Mo.1972). Relying on these two definitions, this Court in *Jackson Excavating v. Admin. Hearing Com'n,* 646 S.W.2d 48, 51 (Mo.1983), found the treatment and purification of water to constitute manufacturing because the process caused "a substantial transformation in quality and adaptability . . . [creating] an end product quite different from the original." More recently, this Court has defined the manufacturing process as one that "requires the manipulation of an item in such a way as to create a new and distinct item, with a value and identity completely different from the original." *House of Lloyd v. Director of Revenue,* 824 S.W.2d 914, 918 (Mo. banc 1992).

■ Although each of the above definitions has its own nuances, the basic concept of what constitutes manufacturing remains the same: Manufacturing consists of the alteration or physical change of an object or material in such a way that produces an article with a use, identity, and value different from the use, identity, and value of the original.

Applying this definition, or for that matter any of the others, we conclude that Galamet does engage in manufacturing. Galamet be-

---

1. Although Galamet was liable for the sales tax and interest thereon, the AHC determined that Galamet was not liable for the additions assessed by the Director because Galamet, as a purchaser, had no duty to file a sales tax return.

gins with automobile bodies and old appliances that are unsuitable for any practical use. Galamet's operation then rends the auto bodies, etc. into steel shreds. Steel shreds are a new article in appearance and composition. Steel shreds have a new value from basic scrap metal, as evidenced by the price each garners on the open market. Most importantly, steel shreds have a new and different use from auto bodies and other scrap metal in that steel mills and foundries can smelt the steel shreds and form new steel products. Thus, the shredded steel that Galamet produces has a new use, value, and character from the auto bodies and metal scrap with which Galamet begins.

The Director argues that Galamet's operation produces no real change in the input material because Galamet essentially begins and ends with metal scrap. In *Jackson Excavating,* the Director took a similar position, arguing that both the beginning and end product of a water purification plant was water and, thus, a *new* article was not produced. *Jackson Excavating,* 646 S.W.2d at 50. In rejecting this argument, this Court noted that in our previous cases, the same argument could have been made. In *West Lake Quarry,* the quarry began with rock and ended with rock; in *Heidelberg,* the printers began and ended with paper. Rather than overrule those cases, this Court found that the deciding factor in the previous cases, and in the case before it, was that the process in question resulted in an end product different in quality and adaptability from the original. *Id.* at 51. In other words, the end product was suitable for new uses. In *Jackson Excavating,* the end result was potable water; in *West Lake Quarry,* rock suitable for use in making road beds; and now, in Galamet's case, steel shreds suitable for use by steel mills.

The Director also contends that this case is like *L & R Egg Co.,* where this Court held that the process of cleaning and culling eggs did not constitute manufacturing. The separation of the non-ferrous metal and fluff from the ferrous metal, according to the Director, is no different than culling bad eggs. However, a close look at the actual grounds for the holding in *L & R Egg Co.* shows that it is distinguishable from this case.

In *L & R Egg Co.,* the Court reached its conclusion not by relying upon the nature of the process and how it was conducted (i.e., culling eggs), but instead by comparing the end product to the input to determine whether there was a substantial change in use. In doing so, the Court found that "the fundamental 'use' for a batch of eggs when it arrives at appellant's plant and when it leaves is the same—consumption," and that the process applied to the eggs made "little difference in the way in which consumers use the eggs." *L & R Egg Co.,* 796 S.W.2d at 626.

Such is not the case with Galamet. The resulting steel shreds are a new product different from the old auto bodies and appliances used for input. The steel shreds will be put to different uses than the scrap metal, which had no use at all. It is only after Galamet has processed the input that a product exists that has a practical use. Thus, *L & R Egg Co.* is inapposite.

Finally, the Director asserts that Galamet's operation is actually recycling, which is not within the exemptions listed in § 144.030.2(5). In support, the Director cites *State ex rel. AMF Inc. v. Spradling,* 518 S.W.2d 58 (Mo.1974), and *Unitog Rental Serv. v. Director of Revenue,* 779 S.W.2d 568 (Mo. banc 1989), in which this Court rejected taxpayer claims that their activities constituted manufacturing, rather than recycling. In *AMF, Inc.,* the taxpayer took worn tire carcasses and added rubber tread to make retreaded tires. In *Unitog,* the taxpayer cleaned and decontaminated industrial uniforms for reuse by companies that rented the uniforms. The distinguishing characteristic, however, is that in both cases the end product had precisely the same use as the input. The worn-out tire had been used as a tire; now retreaded, it would again serve as a tire. Similarly, the uniforms were worn by the same persons in the same work environment both before and after cleaning and decontamination. In the case before us, the steel shreds are not the same product as the input and are not intended for the same use.

Thus, Galamet's activities constitute manufacturing rather than recycling.

### B.

■ The AHC, taking a different approach than the Director, rejected Galamet's claims of exemption on the ground that the product's "new use" is not that of a "product which is intended to be sold ultimately for final use or final consumption" as required by § 144.030.2(5). Specifically, the AHC found that Galamet's shredded steel was not intended for "final use as a product" because it serves as raw material "for a series of processes someone else performs to convert it into a product for final use or consumption." As we understand it, the AHC's decision rests on the idea that "products" include only those items that come off the assembly line of the last manufacturer in the chain. Galamet, on the other hand, contends that the shredded steel is a product sold ultimately to steel mills and foundries for final use or consumption in the subsequent manufacture of steel products.

The AHC's position is unpersuasive. Neither the Director nor the AHC cites to any authority for the proposition that we should distinguish between manufacturers based on their position in the chain of production. More importantly, under the AHC analysis, no company that makes products used solely as component parts for subsequent use by other manufacturers could ever qualify for the exemption.

This Court addressed the issue of multiple manufacturers in *Heidelberg*. The question there presented was whether the printing of stationery products by commercial printers constituted manufacturing. The Director had argued that commercial printers did not manufacture stationery because the stationery was actually "manufactured" by the paper mills that produced the blank paper. This argument was rejected, however, as this Court found that there may be more than one manufacturer in the production processes of many products. 476 S.W.2d at 506.

The AHC distinguished *Heidelberg* by contrasting the blank paper used by the commercial printers from the steel shreds used by the steel mills. In its findings, the AHC noted that the blank paper "could be a final product sold at retail to consumers." While not directly stated, the obvious implication is that steel shreds don't qualify because they are not sold at retail to consumers.

While it is generally true that shredded steel can not be found for sale on the shelves of local department stores, there is no language in the statute that limits the final sale or use of a product only to those "products" purchased in the conventional retail market. Indeed, to limit the view of what constitutes a product only to those items that are ready and available on the market for the general consuming public thwarts the purpose of the exemption statute, which is to promote manufacturing businesses in Missouri. *Heidelberg*, 476 S.W.2d at 506.

Everything considered, this case necessarily turns on the plain language of the statute. As stated, the manufactured products referred to in the statute are those that are "intended to be sold ultimately for final use or consumption." The smelting of steel shreds by steel mills and foundries clearly constitutes "final use or consumption" within the common meaning of those words. Indeed, smelting is the one and only use to which steel shreds are put and for which they are ultimately sold. Furthermore, nothing in the statute implies that products, such as steel shreds, sold as ingredients or component parts from which other manufactured products are made, are not themselves products "sold ultimately for final use and consumption." The words of the statute, taken literally, are simply not qualified in the way that the AHC would qualify them.

In view of the plain language of the statute, the intent of the legislature to encourage the expansion of manufacturing operations in this state, and our decision in *Heidelberg*, we hold that machinery and equipment used directly in manufacturing Galamet's steel shreds qualifies for the sales tax exemption.

### III.

■ Finally, we turn to the question of whether Galamet is entitled to a refund for sales tax paid on electricity purchases made in 1991. As noted, Galamet applied for a

direct pay authorization under § 144.030.2(12), which would have exempted Galamet from paying sales tax to KCP & L on its electrical purchases in 1991. With that authorization, and depending on Galamet's actual electricity purchases and its total production costs for the year, Galamet would potentially have paid sales tax on only a fraction of its electricity purchases. However, when the Director denied Galamet's request for the direct pay authorizations, Galamet paid sales tax on all of its 1991 electricity purchases.

Although the AHC subsequently held that Galamet was entitled to the authorization, it noted that its ruling had no practical meaning because Galamet had already paid the taxes to KCP & L and only KCP & L, as the seller, has the right to request a refund from the Department of Revenue.

The controlling issue is whether Galamet, as a purchaser, has standing to demand a refund directly from the Department of Revenue. Refunds of sales tax are governed by § 144.190, RSMo, and 12 CSR 10–3.516 and 12 CSR 10–3.520. In *Norwin G. Heimos Greenhouse v. Rev. Director,* 724 S.W.2d 505 (Mo. banc 1987), this Court reasoned that the legislature, by use of the general word "person" in § 144.190, intended to allow anyone burdened by the collection of sales tax to request a refund. *Id.,* at 507. While 12 CSR 10–3.520 purported to limit standing only to sellers, the Court held the regulation invalid because it was "plainly inconsistent with the terms of § 144.190." *Id.*

After *Greenhouse,* however, the legislature amended § 144.190 so that the term "person" is now limited to "the person legally obligated to remit the tax." 1988 *Mo. Laws* 571. While purchasers have a statutory duty to pay sales tax to sellers under § 144.060, it is the person receiving that payment who has the duty to "remit" the taxes to the Director. § 144.080.1, RSMo. Thus, the legislature amended § 144.190 with the apparent intent to limit refunds to those who have a legal obligation to pay sales tax directly to the Department of Revenue. Because Galamet has no legal obligation to make this direct payment, it has no standing to request a refund under § 144.190. Galamet's remedy, if any, is to prevail upon KCP & L, the statutory remittor of the sales tax, to apply for the refund.

The decision upholding the assessment of unpaid sales tax is reversed. The decision denying a refund of sales tax is affirmed.

HOLSTEIN, C.J., BENTON, PRICE, ROBERTSON and COVINGTON, JJ., and PREWITT, Special Judge, concur.

WHITE, J., not sitting.