J.B. VENDING COMPANY,
INC., Respondent,

v.

DIRECTOR OF REVENUE, Appellant.

No. SC 82742.

Supreme Court of Missouri,
En Banc.

Sept. 11, 2001.

Jeremiah W. (Jay) Nixon, Atty. Gen., Evan J. Buchheim, Asst. Atty. Gen., Jefferson City, for Appellant.

Edward F. Downey, Jefferson City, John P. Barrie, B. Derek Rose, St. Louis, for Respondent.

LAURA DENVIR STITH, Judge.

The Director of Revenue ("Director") appeals from the decision of the Administrative Hearing Commission ("Commission") granting a refund to J.B. Vending Company, Inc., for sales tax J.B. collected from cafeteria customers at various locations between October 1994 and February 1998. While section 144.020.1(6), RSMo 1994, provides that a tax must be paid on sales at a place where "meals or drinks are regularly served to the public," the Commission reasoned that sales at these cafeterias were not sales to the "public" because only persons who worked in the buildings or legitimate visitors had access to the cafeterias located in the buildings. The Director appeals.

The Commission erred in holding that J.B. does not regularly serve the public in its cafeterias simply because only a subset of the public eats in those cafeterias. J.B. makes its cafeteria services available to those building owners who wish to contract for its services and serves all those who seek to eat in its cafeterias. Those cafeterias do not become nonpublic merely because the buildings in which they are located happen to restrict access to those buildings. Accordingly, the decision of the Commission is reversed, and the case is remanded.

## I. FACTUAL AND PROCEDURAL BACKGROUND

From October 1994 to February 1998, J.B. operated a vending and food service business. J.B. placed and maintained vending machines and operated cafeterias or "lunchrooms" in the manufacturing plants or. business facilities of thirteen companies in the St. Louis and Cape Girardeau areas. In operating these food service facilities, J.B. largely employed its own food service equipment and maintained a fleet of 130 vehicles. J.B.'s employees operated and maintained the cafeterias, including operating the cash registers where customers paid for their meals.

All thirteen manufacturing or business facilities at which J.B. operated a cafeteria restricted access to their buildings to employees and others that had a legitimate business reason to be on the premises. In most cases, employees of the various facilities could gain access through the use of a coded "swipe card." In other cases, employees were required to check in with a receptionist or security guard before being admitted to the facility. Only authorized visitors were permitted into each building, and they had to be admitted by a receptionist or guard.

Anyone who had gained entry into one of the thirteen buildings in which J.B. operated was able to eat in J.B.'s cafeteria in that building. The cost of food in the cafeterias was not subsidized by the business owners; employees and visitors paid for their own food. No special card or other form of identification was required to be allowed to eat in the cafeterias. As a practical matter, however, only those who were permitted to enter one of the buildings could enter the cafeterias.

J.B.'s cafeterias served their products via hot food lines, and most facilities had salad bars. J.B. cooked or otherwise prepared approximately 85 percent of the food and drinks sold in its cafeterias. The remaining 15 percent of J.B.'s sales involved pre-packaged items or other food products that were sold without preparation, including single-serving size packaged drinks, snacks, cereal, fruit, ice cream and condiments.

During the tax periods at issue here, J.B. did not pay sales tax on its purchase of food that it later sold in these cafeterias. Rather, it issued tax-exemption certificates to its suppliers, and then collected sales tax from its cafeteria customers on its sales of meals and drinks. It subsequently sought from the Director a refund of the tax it had collected from its customers from October 1994 to May 1997. It noted that section 144.020.1(6), RSMo 1994, imposed a sales tax only on sales at places in which meals or drinks are "regularly served to the public" and claimed it regularly served meals and drinks only to employees and legitimate visitors to the buildings where its cafeterias were located, not to the public. J.B. also sought, on the same grounds, a refund of sales tax it had paid under protest from June 1997 to February 1998. The Director denied the refunds.

J.B. filed several complaints with the Commission, challenging the Director's decision denying its refund claims. Following a hearing and the filing of stipulations of fact, the Commission found that J.B. was entitled to a refund. The Commission reasoned that the sales in J.B.'s cafeterias were not taxable under section 144.020.1(6) because the cafeterias were not places that regularly served the public in that they were located in buildings to which access was restricted to employees and legitimate visitors. The Commission further refused the Director's request that it offset J.B.'s refund by the amount of sales tax that J.B. avoided on its purchases of food that it later sold in its cafeterias by issuing exemption certificates to its suppliers. The Commission noted that the Director had never assessed J.B. for this tax, and the Commission did not have authority to make "assessments of taxes *ab initio*."

The Director appeals.

## II. SALES TO THE PUBLIC

■ The Director contends that the Commission erred in determining that J.B.'s sales of meals and drinks were not taxable under section 144.020.1(6). Review of the Commission's decision is limited to a determination "whether that decision was supported by competent and substantial evidence on the whole record, or whether it was arbitrary, capricious, unreasonable, unlawful, or in excess of jurisdiction." *Psychiatric Healthcare Corp. of Mo. v. Department of Social Services, Div. of Medical Services,* 996 S.W.2d 733, 735 (Mo.App. W.D.1999).

Section 144.020.1(6) imposes a sales tax as follows:

A tax equivalent to four percent on the amount of sales or charges for all rooms, meals, and drinks furnished at any hotel, motel, tavern, inn, restaurant, eating house, drugstore, dining car, tourist cab-

in, tourist camp or other place in which rooms, meals or drinks are *regularly served to the public;* ...

Sec. 144.020.1(6) (emphasis added).

The Commission found that the word "public" as used in section 144.020.1(6) should be given its ordinary dictionary meaning which the Commission stated was "the people as a whole: populace," quoting *Merriam–Webster's Collegiate Dictionary* 944 (10th Ed.1993). The Commission then concluded that J.B.'s sales of meals and drinks at the cafeterias in question were not "regularly served to the public" because the entire populace could not actually eat in its cafeterias. The Commission reasoned that only persons permitted to enter the restricted-access buildings in which the cafeterias were located could reach the cafeterias. The Commission, therefore, concluded that J.B.'s sales made in these facilities were not taxable under section 144.020.1(6) as meals or drinks regularly served to the public.

In so concluding, the Commission relied on this Court's decision in *Greenbriar Hills Country Club v. Director of Revenue*, 935 S.W.2d 36 (Mo. banc 1996). In *Greenbriar*, the issue was whether, under section 144.020.1(6), sales by a country club of meals and drinks to its members constitute "sales to the public," thereby rendering them taxable under section 144.020.1(6). *Id.* at 36–37. This Court held that because the country club served meals and drinks only to its members and guests, and concededly did not serve them to the public, these sales were not subject to the sales tax provisions in section 144.020.1(6). *Id.* at 38. This Court subsequently reaffirmed this holding in *Westwood Country Club v. Director of Revenue*, 6 S.W.3d 885, 887 (Mo. banc 1999).

To the extent that the Commission interpreted *Greenbriar* or *Westwood* to hold that sales to any restricted segment or subset of society do not constitute sales to the public, it was incorrect. In *Greenbriar*, the Director conceded that sales by a country club to its own members did not constitute sales to the public. This Court, therefore, never reached the issue of what types of sales do or do not constitute sales to the "public." *Westwood* simply applied the principles from *Greenbriar* in deciding whether a country club was required to pay sales tax on its own purchases of goods that it would later serve its members and, therefore, also did not attempt to define what is meant by the word "public" as used in section 144.020.1(6).

■ The definition of "public" as used in section 144.020.1(6) is properly before the Court here, however. This Court rejects J.B.'s argument the statute's use of the phrase "served to the public" means that a seller owes sales tax only if the seller makes its product available to the entire populace.

The word "public" conveys several meanings. While the word "public" can refer to the entire populace, it can also refer to "[a] particular body or section of the people; often, .... a clientele ..." *Webster's New Int'l Dictionary* 2005 (2d Ed.1952). It can also refer to "a group of people distinguished by common interests or characteristics." *Webster's Third New Int'l Dictionary* 1836 (1993). "In another sense the word does not mean all the people, nor most of the people, nor very many of the people of a place, but so many of them as contradistinguishes them from a few." *Black's Law Dictionary* 1227 (6th Ed.1990).

These definitions are consistent with prior cases specifically recognizing that an entity can be said to serve the public even if it serves only a subset or segment of the public and is subject to regulation on that basis. Thus, in *State ex rel. Anderson v.*

*Witthaus,* 340 Mo. 1004, 102 S.W.2d 99 (banc 1937), this Court held that a business entity that selectively offered its charter bus services only to chosen segments of the general public, such as schools, clubs and churches, nevertheless constituted an entity that served the public, stating that the company held itself in "readiness to engage with anyone who might apply," *Id.* at 101, and that, "[t]he test is whether he has invited the trade of the public ... But, 'the public does not mean everybody all the time'." *Id.* at 102.[1]

Similarly, in the context of eminent domain, this Court has found that "public" use includes a use that benefits a particular group of persons. "[I]t is not necessary that the whole community or any large part of it should actually use or be benefited by a contemplated improvement. Benefit to any considerable number is sufficient.... Nor does the mere fact that the advantage of a public improvement also inures to a particular individual or group of individuals deprive it of its public character." *Arata v. Monsanto Chemical Co.,* 351 S.W.2d 717, 721 (Mo.1961). *See also City of Kansas City v. Hon,* 972 S.W.2d 407, 414 (Mo.App. W.D.1998) (a city's decision to acquire land through eminent domain for the specific purpose of attracting a segment of the public, such as air cargo and aircraft manufacturers, does not preclude finding a "public" use).

 While the cases just cited involved factual contexts other than determining who serves the public for the purpose of imposing sales tax, the principle they state—that the "public" includes a subset of the populace—is directly applicable here. J.B. holds itself out to serve those members of the public who come into its establishment, and the fact that some third party limits those who are able to reach that establishment does not mean that J.B. does not serve meals and drinks to the public. It does.

The dissenting opinion nonetheless suggests that this Court should hold that, because the word "public" may mean either the entire populace or some subset thereof, it is ambiguous and so must be construed to refer to the entire populace, as this is the most favorable interpretation for the taxpayer. In other words, because only employees who work in and visitors to a building where one of J.B.'s cafeterias is located have a realistic opportunity to reach the cafeteria in that building, the entire populace cannot be said to have access to each cafeteria. Therefore, the dissent argues, J.B.'s cafeterias cannot be said to serve meals and drinks to the "public" within the meaning of section 144.020.1(6).

 This argument is unconvincing. The canon of statutory construction that says that ambiguities must be construed in favor of the taxpayer does not mean that a statute is ambiguous every time it uses a word that *can* have more than one meaning. The issue is not whether a particular word in a statute, considered in isolation, is ambiguous, but whether the *statute* itself is ambiguous. This follows from the fact that the goal in interpreting a statute is to determine the legislative intent, and to do that one must consider the meaning of a particular word in the context of the entire statute in which it appears. *Household Finance Corp. v. Robertson,* 364 S.W.2d 595, 602 (Mo. banc 1963); *State ex*

---

1. *See also Voelker v. St. Louis Mercantile Library Ass'n,* 359 S.W.2d 689 (Mo.1962) (charity may be public even though it restricts its benefits to a subset of the public); *Salvation Army v. Hoehn,* 354 Mo. 107, 188 S.W.2d 826, 830 (banc 1945) (Salvation Army was a charity even though it limited access to its hotel to those who submitted applications, for a "charity may restrict its admissions to a class of humanity, and still be public....").

*rel. Casey's General Stores, Inc. v. City of West Plains,* 9 S.W.3d 712, 717 (Mo.App. S.D.1999).

▉ Similarly, the mere fact that the litigants disagree over the meaning of "public" does not render the statute ambiguous. *Bank of America National Trust and Savings Ass'n v. 203 North LaSalle Street Partnership,* 526 U.S. 434, 461, 119 S.Ct. 1411, 143 L.Ed.2d 607, (1999). An ambiguity means "duplicity, indistinctness or uncertainty of meaning of an expression...." *Lehr v. Collier,* 909 S.W.2d 717, 721 (Mo.App. S.D.1995), *quoting, Schupbach v. Schupbach,* 760 S.W.2d 918, 923 (Mo.App. S.D.1988). Here, when the statute as a whole is considered, the intent of the legislature and the language of the statute are both intrinsically clear.

Subsection 144.020.1(6) is part of section 144.020. The latter section is entitled "Rate of tax—tickets, notice of sales tax" and begins:

> (1) A tax is hereby levied and imposed upon all sellers for the privilege of engaging in the business of selling tangible personal property or rendering taxable service at retail in this state. The rate of tax shall be as follows:

*Id.* The statute then divides into six categories those sales that are either sales of personal property or sales of taxable service at retail. It then sets the rate of tax for each category at four percent, although the legislature could set different tax rates for different categories should it so choose. Subsection (6) provides for a tax on places that regularly serve meals or drinks to the public.

Considered in context, the statute as a whole clearly evinces a legislative intent to tax all sellers for the privilege of selling tangible personal property or rendering taxable retail service. The purpose of the specific subsections thereunder is to set out the types of retail sales and services that shall be taxed at particular rates. This interpretation allows the statute as a whole, and subsection 144.020.1(6) in particular, to be read in harmony.

It would be inconsistent with the broader legislative purpose of section 144.020 to read subsection 144.020.1(6) as if it granted an exemption from sales tax for all sales of meals and drinks that the entire populace might not be able to buy at any particular time, as the dissent suggests that the legislature intended. If the fact that only a segment of the public could gain access to buildings where J.B. operated meant that J.B. did not sell to the public, then almost no sales of meals and drinks would come within the statute. Only a limited part of the public ever has the practical ability to enter any particular business establishment. Any restaurant that serves only those individuals who have reservations could claim it did not sell to the public. In fact, under the dissenting opinion's approach, the owner of a restaurant could avoid sales tax any time a building owner set a limiting criterion for entering the building—and it would not matter whether that criterion was being an employee who worked in the building, wearing business attire, being over a set age, or meeting some other criterion.

Similarly, any business owner that operates a concession stand in a professional sports arena that serves only those who have tickets to the event could claim it does not serve meals or drinks within the meaning of subsection 144.020.1(6). Having limited that part of the public who could enter the building, any meals or drinks they might buy would not be subject to tax, for only those who met the criterion for entry could actually buy meals or drinks in the building.

Certainly, this cannot be the legislature's intent, for to so read the statute would effectively nullify the provision for imposing a tax on the sale of meals or drinks to the public. Few businesses would qualify for the tax. Almost any business serving meals and drinks could create some access-limiting criterion and then argue that it was not open to the public. The legislature instead intended that all retail sales of personal property and taxable service be taxable. To construe the word "public" in a manner that will render the majority of such sales of meals and drinks untaxable is inconsistent with the legislative purpose. This construction cannot be the correct understanding of the word.

J.B. does not address these issues of legislative intent, but instead focuses on the fact that its sales are almost entirely to employees, and narrowly argues that this is sufficiently distinct from other types of sales that it should not be considered a sale to the public and so should not be subject to sales tax. But, even if a sale of meals or drinks to one's own employees would be sufficiently distinct that it would not constitute a taxable sale of meals or drinks "to the public," [2] that is not the situation before us in this case.

While it is true that those who eat at J.B.'s cafeterias are usually employees, they are not J.B.'s employees. J.B.'s employees are the people who staff its cafeterias, for J.B. is in the business of operating cafeterias in buildings. As to J.B., the persons it sells meals and drinks to are, in effect, strangers; they are just those members of the public whom the building owners allow in the building. They have no contractual or other special relationship with J.B. The fact that J.B. sells food to someone else's employees does not render it unique—any food seller normally does that. In arguing otherwise, J.B. improperly mixes its role with that of the employers who own the buildings in which it operates.

In sum, J.B. holds itself out ready to contract for cafeteria services with any company that hires its services. It has, in fact, contracted with thirteen employers who own restricted-access buildings to sell meals and drinks to anyone who comes to J.B.'s cafeterias in those buildings. While some of the employers with whom J.B. contracts limit who can enter their buildings, that is the choice of the employer. J.B. does not limit sales to only its own employees, or even to only building employees. It holds itself out ready to contract with any employer and to serve those who present themselves at its cafeteria lines and serves all who appear at its cafeterias. Identification is not required. Any member of the public who can gain access to the building can eat in the cafeteria. J.B.'s cafeterias regularly serve meals and drinks to the public.

---

**2.** *Greenbriar* held that sales by a club of meals and drinks to its own members did not constitute sales to the public, and therefore were not taxable under section 144.020.1(6). It found that section 144.020.1(6) and section 144.020.1(2) were inconsistent in that subsection (2) appeared to impose a tax on fees paid to places of amusement whereas subsection (6) says that such sales are not taxable if they are not to the public. The Court determined that where two statutes on the same subject conflict, the more specific controls over the more general. *See, e.g., Terminal R.R. Ass'n of St. Louis v. City of Brentwood*, 360 Mo. 777, 230 S.W.2d 768, 769 (1950). But, this precept applies only where the two provisions are in such conflict that they cannot be harmonized. In *Greenbriar*, the two sections could be harmonized by recognizing that subsection (2)'s tax applied only to fees paid to places of amusement. The money paid for meals and tips in *Greenbriar* did not constitute a fee but rather constituted the price of the meal and the service being provided. Hence, the two sections could be harmonized.

## III. CONCLUSION

Section 144.020.1(6) imposes a sales tax on a restaurant "or other place in which rooms, meals or drinks are regularly served to the public." As used in section 144.020.1(6), the word "public" means those members of the public who can patronize a business. The fact that someone other than the seller—here, the building owner—artificially limits who can do so, does not change the fact that those who reach the cafeteria are members of the public; hence, the sale of meals or drinks to them is taxable. J.B.'s cafeterias in the thirteen buildings at issue here do regularly serve meals or drinks to the public; the sales, therefore, were subject to sales tax. The Commission erred in holding otherwise.[3]

The Commission's decision is reversed, and the cause remanded.

WHITE, HOLSTEIN, WOLFF and BENTON, JJ., concur.

PRICE, J. dissents in separate opinion filed.

LIMBAUGH, C.J., concurs in opinion of PRICE, J.

PRICE, Judge, dissenting.

I respectfully dissent from the majority opinion. I would affirm the decision of the Administrative Hearing Commission that sales of food and drinks in cafeterias open only to employees and legitimate visitors in buildings not open to the public are not subject to the sales tax imposed pursuant to section 144.020.1(6). The express words of that section, as applicable here, provide that the tax is to be imposed only in a "place in which rooms, meals or drinks are regularly served to the public."

There is no issue of fact. The cafeterias in question are located in buildings that are not open to the general public. The cafeterias only serve those workers in the buildings and their legitimate guests. The sole legal issue is quite simple. Is a cafeteria open only to employees and legitimate visitors, but not open to any others, a place where meals or drinks are regularly served to the "public"? In the ordinary use of that word, I do not think so.

The Commission found that the word "public" as used in section 144.020.1(6) should be given its ordinary dictionary meaning "the people as a whole: populace". *Merriam–Webster's Collegiate Dictionary, 944 (10th Ed.1993)*. The majority does not challenge that the word "public" can be and is so defined. In fact, particularly pertinent here, *Webster's Third New International Dictionary, 1836 (1981)*, gives as one of its definitions of the word public, "a place accessible or visible to all members of the community".

The majority instead relies upon three other definitions that recognize that the word "public" might also refer to a smaller subset. At most, this would merely establish an ambiguity as to which use of the word was meant. Interestingly, the entire quotation from *Black's Law Dictionary, 1227 (6th Ed.1990)*, one of the dictionary's cited by the majority reads:

> The whole body politic, or the aggregate of the citizens of a state, nation, or municipality. The inhabitants of a state, county, or community. In one sense, everybody, and accordingly the body of the people at large; the community at large, without reference to the geographical limits of any corporation like a city, town, or country; the people. In

---

**3.** Because of our resolution of this issue, the other issue raised by the Director does not need to be addressed.

another sense the word does not mean all the people, nor most of the people, nor very many of the people of a place, but so many of them as distinguishes them from a few. Accordingly, it has been defined or employed as meaning the inhabitants of a particular place; all the inhabitants of a particular place; the people of the neighborhood. Also, a part of the inhabitants of a community.

If there are two "senses" or meanings to the word "public", then its use is ambiguous. In such a situation we are not free to adopt either meaning at our discretion. Instead, our rule of construction concerning ambiguity in the language of statutes imposing taxes has been clear and consistent. If an ambiguity exists in a statute imposing a tax it must be resolved in favor of the taxpayer. *Moore Leasing, Inc. v. Director of Revenue, 869 S.W.2d 760, 761 (Mo. banc 1994); Ryder Student Transportation Services, Inc. v. Director of Revenue, 896 S.W.2d 633, 634 (Mo. banc 1995); Delta Air Lines, Inc. v. Director of Revenue, 908 S.W.2d 353, 356 (Mo. banc 1995); Old Warson Country Club v. Director of Revenue, 933 S.W.2d 400, 403 (Mo. banc 1996).*