**SHELTER MUTUAL INSURANCE COMPANY, Respondent,**

v.

**DIRECTOR OF REVENUE, Appellant.**

No. SC 84617.

Supreme Court of Missouri,
En Banc.

May 27, 2003.

Evan J. Buchheim, Attorney Generals Office, Jefferson City, for appellant.

Edward F. Downey, Bryan Cave LLP, Jefferson City, Juan D. Keller, John P. Barrie, B. Derek Rose, Bryan Cave LLP, St. Louis, for respondent.

WILLIAM RAY PRICE, JR., Judge.

## I.

The Director of Revenue seeks review of the decision of the Administrative Hearing Commission ("AHC") that Shelter Mutual Insurance Company's cafeteria sales were not taxable under section 144.020.1(6), RSMo 2000.[1] The decision of the Administrative Hearing Commission is affirmed.

## II.

Shelter is a mutual benefit insurance company with its main office and corporate headquarters in Columbia, Missouri. Shelter limits access to the large office building at its headquarters by use of a key card system and receptionist. Only Shelter employees are issued key cards. Authorized guests may enter the building only after first seeing the receptionist and then only after a Shelter employee signs in the visitor and escorts the visitor through the building.

Shelter owns and operates a cafeteria-style dining facility within its office building for the convenience of its officers and employees. The cafeteria serves meals and drinks to Shelter employees and authorized visitors escorted to the cafeteria by a Shelter employee. All patrons are charged for food and beverages purchased at the cafeteria. However, Shelter subsidizes the operation of the cafeteria and the amount charged to cafeteria patrons does not cover the operating costs of running the cafeteria.

During the tax period at issue, Shelter did not pay sales tax on its purchases of food, drink or other restaurant supplies. Rather, Shelter issued tax exemption certificates to its suppliers on the basis that it was purchasing the items for resale. Shelter did, in fact, collect and remit to the Director sales tax on its sales of meals and drinks in the cafeteria in the amount of $110,053.97 during the tax period. Shelter thereafter sought a refund of that amount on the basis that the cafeteria is not a place that regularly sells meals and drinks to the public. The Director denied Shelter's claim. Shelter sought review of the Director's decision by the AHC, which ordered the refund.

## III.

"This Court has jurisdiction pursuant to Mo. Const. art. V, section 3 and reviews the AHC's interpretation of revenue law *de novo*." *Southwestern Bell v. Dir. of Revenue*, 94 S.W.3d 388, 390 (Mo. banc 2002) (citations omitted). "This Court will uphold the AHC's decision if authorized by law and supported by competent and substantial evidence upon the whole record." *Id.* (internal quotations omitted) (citing section 621.193, RSMo 2000; *Southwestern Bell v. Dir. of Revenue*, 78 S.W.3d 763, 765 (Mo. banc 2002) (citations omitted)).

---

1. All statutory references are to RSMo 2000 unless otherwise stated.

## IV.

■ Section 144.020.1(6) levies a tax on "the amount of sales or charges for all ... meals and drinks furnished at any hotel, motel, tavern, inn, restaurant, eating house, drugstore, dining car, tourist cabin, tourist camp or other place in which ... meals or drinks *are regularly served to the public*." (emphasis added). This Court has previously addressed this language in *Greenbriar Hills Country Club v. Director of Revenue*, 935 S.W.2d 36 (Mo. banc 1996), and *J.B. Vending Co. v. Director of Revenue*, 54 S.W.3d 183 (Mo. banc 2001). A close reading of these cases reveals more than one criteria for determining whether a taxpayer regularly serves meals and drinks to the public.

### A.

One criteria utilized in *Greenbriar Country Club* focused on the special relationship between the taxpayer and those to whom it serves meals and drinks. Greenbriar Country Club operated as a cooperative association for the benefit of its members and provided recreational and dining facilities to its members and their invited guests. *Greenbriar*, 935 S.W.2d at 37. Greenbriar charged a flat monthly fee to its members, covering a fixed gratuity for its food and beverage services, which this Court determined to be "part of Greenbriar's charge for meals and drinks." *Id.* at 36–38. However, the Director stipulated that Greenbriar did not serve meals and drinks to the public, but only to its members and their invited guests. *Id.* at 38. Because of the special relationship between co-owners or members and their association, there were no sales "to the public." [2]

*J.B. Vending* was also decided, in part, based upon a lack of any special relationship between J.B. Vending Co. and those that it served in its cafeterias. J.B. argued that it only served employees and thus, did not regularly serve the public. *J.B. Vending*, 54 S.W.3d at 189. However, its sales were not to its own employees, but those of its client-companies. *Id.* This Court specifically noted that those eating in the cafeterias had "no contractual or other special relationship with J.B. [Vending]." *Id.* Thus, J.B.'s patrons were no different than "typical" restaurant patrons, most of whom would certainly be some other's employee. *Id.*

*Wellesley College v. Attorney General*, 313 Mass. 722, 49 N.E.2d 220 (Mass.1943), presents a remarkably similar situation to Shelter's and was also decided, in part, based upon a special relationship between the college and the patrons it served in its cafeterias. Massachusetts imposed a sales tax on meals "furnished at any restaurant, eating house, hotel, drug store, club, resort or other place where meals or food are regularly served to the public." *Id.* at 227. The college provided cafeteria service to dormitory residents and allowed non-resident students, faculty and invited guests to purchase meal tickets for use in its cafeterias. *Id.* at 223. Thus, there existed a special relationship between the college and its students and employees sufficient to render those sales nonpublic.

### B.

Another related criteria for determining taxability is "whether [the taxpayer] ... invited the trade of the public ..." *J.B. Vending*, 54 S.W.3d at 187 (citing *State ex rel. Anderson v. Witthaus*, 340 Mo. 1004, 102 S.W.2d 99 (Mo banc 1937)). Indeed,

---

2. It is questionable that *Greenbriar* involved a sale at all. Rather, the transaction might more appropriately be viewed as an accounting of expenses among the co-owners of the country club.

*J.B. Vending* referred to this test no less than four times, noting, for example, that J.B. Vending "holds itself out ready to contract for cafeteria services with any company that hires its services." *Id.* at 189, 184, 187.

Greenbriar Country Club, unlike J.B. Vending, did not hold itself out as ready to contract with the public. Rather, Greenbriar served only its members and their invited guests. *Greenbriar*, 935 S.W.2d at 37. Even the Director stipulated that Greenbriar did not serve the public. *Id.* at 38.

*Wellesley College* based its decision primarily on this test. In determining that it was "plain that the college was not engaged in the business of regularly serving meals or food to the public", *Wellesley College*, 49 N.E.2d at 227, the court said:

Furnishing food to a comparatively small group of tenants for a short period of time is not serving food to the public within the meaning of the statute. The dining accommodations at the college are not open to the public. They are restricted to a small, well defined number of classes to the members of which they are available. The maintenance of dining rooms is not conducted as a commercial enterprise, separate and independent of the various other activities of the [college], but is conducted as an incidental but necessary undertaking if the college is to continue to function as an educational institution. . . .

*Id.*

## C.

The majority in *J.B. Vending* also based their decision, in part, on a determination that the word "public" as used in section 144.020.1(6) was not limited to the public as a whole, but also referred to subsets of the public. Two judges disagreed with that interpretation of the word public. That disagreement is irrelevant to the Court's decision here, however, for whichever meaning of the term "public" is correct, *J.B. Vending* did not hold that being a member of a subset of the public would provide a sufficient basis to impose the tax where, as here, the seller and buyer have a special relationship and the seller does not invite the trade of the public. For this reason, the Director's reliance on *J.B. Vending* is misplaced.

## D.

As in *Greenbriar* and *Wellesley College*, and unlike *J.B. Vending*, there exists a special relationship between Shelter and those it serves in its cafeteria. Shelter's employees are not merely "typical" restaurant patrons, but are bound to Shelter by a special relationship. Thus, to the extent that Shelter sells meals and drinks to its own employees, it clearly is not regularly serving the public. Further, Shelter's *de minimus* sales directly to authorized and escorted guests should not invoke the taxing provisions of section 144.020.1(6).

It is also clear that Shelter has not "invited the trade of the public. . . ." *J.B. Vending*, 54 S.W.3d at 187. Just as Wellesley College did not maintain its cafeterias "as a commercial enterprise", *Wellesley College*, 49 N.E.2d at 227, neither did Shelter provide its dining services as "separate and independent", *Id.*, of its primary business of insurance. Like Wellesley College, Shelter offered meals and drinks to its employees "as an incidental but necessary undertaking", *Id.*, of its insurance business. In fact, Shelter deemed its cafeteria service so vital to the convenience and productivity of its employees that it subsidized the cafeteria's operating costs; offering the meals and drinks to its employees at prices insufficient to cover cafeteria operations.

Shelter's special relationship with those it serves and the fact that Shelter does not

invite the trade of the public clearly establish that Shelter does not regularly serve meals or drinks to the public. As such, the taxing provisions of section 144.020.1(6) cannot apply.

## V.

▇▇▇ The Director argues that any refund due Shelter should be offset by the amount of unpaid tax due.[3] *See Westwood Country Club v. Dir. of Revenue*, 6 S.W.3d 885, 887–88 (Mo. banc 1999). However, under section 144.250,[4] when there is an alleged failure to remit taxes, the Director is required make an assessment of the delinquent tax and give notice of the estimated assessment. This assessment must be made before any refund can be credited toward the unpaid tax. *Dyno Nobel, Inc. v. Dir. of Revenue*, 75 S.W.3d 240, 243–44 (Mo. banc 2002). Further, the director has only three years to make any additional assessment of tax.[5]

The Director contends that Shelter's stipulation of a possible tax amount relieved her from the assessment requirement. The stipulation stated: "If tax was due on Shelter's purchases of meal and drink components, Shelter would have incurred $50,456 in Missouri and local sales tax for the periods October 1995 through March 1999 ("Tax Periods")." This statement stipulated only the amount of possible tax, "[i]f tax was due", not that such amount was actually due and owing. Shelter did not specifically agree to this amount as an offset, nor does Shelter concede that it had no defenses or other affirmative avoidance to any such assessment. In fact, the stipulation was made after the applicable statute of limitations period had run. *See* section 144.220.

▇▇▇ "The statute of limitations may be suspended or tolled only by specific disabilities or exceptions enacted by the Legislature and the courts are not empowered to extend those exceptions." *Cooper v. Minor*, 16 S.W.3d 578, 582 (Mo. banc 2000). Section 144.220 has only one exception to the running of the statute that could apply in this case: "[A] fraudulent return or [ ] neglect or refusal to make a

---

**3.** Section 144.190.2 provides:
If any tax ... has been paid ... erroneously ... such sum shall be credited on any taxes then due from the person legally obligated to remit the tax ... and the balance, with interest ... shall be refunded to the person legally obligated to remit the tax, but no such credit or refund shall be allowed unless duplicate copies of a claim for refund are filed within three years from date of overpayment.

**4.** Section 144.250 provides:
4. Except in cases of fraud or evasion, if a person neglects or refuses to make a return and payment as required by sections 144.010 to 144.525, the director of revenue shall make an estimate based upon any information in his possession or that may come into his possession of the amount of the gross receipts of the delinquent for the period in respect to which he failed to make return and payment, and upon the basis of said estimated amount compute and assess the tax payable by the delinquent; such estimate may be reconstructed for that period of time for which the tax may be collected as prescribed by law.
5. Promptly thereafter, the director of revenue shall give to the delinquent written notice of such estimated assessment, the notice to be served personally or by certified or registered mail at his or its last known address.

**5.** Section 144.220 states:
1. In the case of a fraudulent return or of neglect or refusal to make a return with respect to any tax under this chapter, there is no limitation on the period of time the director has to assess.
. . . .
3. In other cases, every notice of additional amount proposed to be assessed under this chapter shall be mailed to the person within three years after the return was filed or required to be filed.

return...." *Id.* "Whether a tax return is fraudulent is to be determined by considering all the facts and circumstances of each case. The elements of fraud include a positive, intentional deceit or subtle device to escape the sales tax." *Odorite, Inc. v. Dir. of Revenue,* 713 S.W.2d 833, 839 (Mo. banc 1986). "A misrepresentation as to a question of law is not fraud. And the question of what constitutes a ... 'sale for resale' or 'sale at retail' is a question of law." *Id.* Shelter did not file a fraudulent return or refuse to make a return. No exception to the statute of limitation applies. The limitations period had passed when Shelter entered the stipulation.

The Director did not raise the issue of an offset in its pleadings to the AHC. The only issue presented was Shelter's refund claim.[6] At the time the Director raised this issue and Shelter stipulated to a possible tax amount, the three-year limitations period had passed. The AHC's refusal to consider the Director's request for an offset of any tax refund was "authorized by law and supported by competent and substantial evidence...." *Southwestern Bell,* 94 S.W.3d at 390.

### VI.

For the foregoing reasons, the decision and judgment of the Administrative Hearing Commission is affirmed.

LIMBAUGH, C.J., WHITE, BENTON, STITH and TEITELMAN, JJ., concur.

WOLFF, J., concurs in part and dissents in part in separate opinion filed.

MICHAEL A. WOLFF, Judge, concurring in part and dissenting in part.

I concur in part and dissent in part, as follows:

1. I agree with Shelter's contention that its cafeteria is not a "place in which ... meals or drinks are regularly served to the public." Section 144.020.1(6). The principal opinion's conclusion is supported by the fact that Shelter prices its food so low that it operates the cafeteria at a loss as a service to its employees. Thus, Shelter is not trying to attract business for its cafeteria from the public at large because obviously it has no intent to underwrite the cost of meals for the public.

2. I dissent from the principal opinion's conclusion that the state has waived its right to an offset of the $50,456 in taxes that Shelter owes on its purchases of food for the cafeteria.

3. When a seller receives a refund of sales tax collected from customers—with no obligation to pay the amounts back to its customers—the seller "taxpayer" is unjustly enriched. Ordinarily I believe the Court should impose a constructive trust, in favor of the customers who were charged for the sales tax, on the refund amounts to prevent unjust enrichment. However, such a remedy is not warranted in this case because Shelter, in subsidizing the cafeteria's operations for the benefit of its employees, is not being unjustly enriched because of the benefits being given to the employees.

1. **Serving the Public—Section 144.020.1(6)**

Relying in part on so-called "country club" or "member only" cases, the principal opinion concludes that meals sold at

---

**6.** The claim for refund does not list any ground concerning an offset, therefore sections 144.190.2 and 144.190.3 do not authorize an offset. *See IBM v. Dir. of Revenue,* 765 S.W.2d 611, 612–13 n. 5 (Mo. banc 1989).

Shelter's cafeteria were not taxable under section 144.010.1(6) because a "special relationship" between Shelter and its employees exists such that when Shelter sells food to its own employees, it is not regularly serving the public. Sales to non-employees—authorized and escorted guests—were found to be *de minimus* so as not to invoke taxation.

I believe that the so-called "country club" exception is contrary to the taxing statute and offensive to the concept of fair taxation. *See Greenbriar Hills Country Club v. Director of Revenue*, 47 S.W.3d 346 (Mo. banc 2001). On this point, accordingly, I concur in the result but would use an alternate analysis that focuses on Shelter's lack of intent to sell its meals to the public.

Section 144.020.1(6) imposes a tax on "places in which ... meals are regularly served to the public." When meals are served to a non-employee at Shelter's cafeteria, Shelter collects money directly from the patron. This arrangement is different from that at country clubs where the club collects money for meals served to members' guests directly from its members.

In light of this special relationship between a country club and its members, a "country club" exception was fashioned—inappropriately, in my opinion—to exclude taxation of meals served by a country club to its member and members' guests. Usually the club member—and not the guest—pays the bill. Otherwise the guest, who is not a member of the club, would logically be a member of the public.

The same is true at Shelter. When a patron at the cafeteria is an employee's guest or a person who happens to be in the building delivering supplies, that person is not an employee and, thus, is not a member of the "club". If Shelter wants to use the country club exception, it should sell only to its employees.

If the employee has a guest, the employee should pay for his guest's food. Otherwise, anyone who is in the building—say, to deliver supplies—can buy a meal at the cafeteria. If that were so, then the cafeteria would be a place where meals are regularly served to the public. This would seem no different than *J.B. Vending* where the court noted that those eating in the cafeterias had no relationship with the vendor, which makes them more like typical restaurant patrons. *J.B. Vending Co. v. Director of Revenue*, 54 S.W.3d 183, 189 (Mo. banc 2001).

So, how is Shelter's cafeteria different from *J.B. Vending?* It is different, perhaps, in this unusual case because Shelter actually underwrites a portion of the cost of providing food to its employees. The principal opinion properly notes that Shelter has not "invited the trade of the public" where it offers meals at prices too low to cover operation costs. That is dispositive of its intention not to serve the public. Shelter obviously has no interest in attracting customers from the outside, because it loses money on the meals. For this reason, I concur in the result on this point.

## 2. The State Should Be Allowed to Keep the Amount Shelter Owes

I dissent, however, from the majority's conclusion that Shelter's refund should not be offset by the amount of unpaid tax due. Because Shelter purchased its food, drink and restaurant supplies for resale, it gave its suppliers an exemption from sales tax on the grounds that the food would be sold at retail and the tax would be collected from Shelter's customers. Shelter did indeed collect from its customers sales taxes in the amount of $110,053.97, which it remitted to the director.

Shelter then sought a refund of that $110,053.97 amount and brought this pro-

ceeding. In seeking a refund, Shelter stipulated in this proceeding that "[i]f tax was due on Shelter's purchases of meal and drink components, Shelter would have incurred $50,456 in Missouri and local sales tax" for the relevant tax periods. This stipulation is an admission by Shelter that any refund received should be offset by taxes due on its purchases of meal and drink components. This admission indicates that Shelter knew of its tax liability.

Shelter argues that the director failed to notify it of the tax liability within the three-year statute of limitations in Section 144.220.3 by not claiming an offset in this proceeding.

Shelter should not prevail on this point. First, by stipulating as to tax owed, Shelter waived the statute of limitations defense. A statute of limitations may be waived if there is a "clear, unequivocal and decisive act of the party showing such purpose." *Schwab v. Brotherhood of Am. Yeomen,* 305 Mo. 148, 264 S.W. 690, 692 (1924); *Dice v. Darling,* 974 S.W.2d 641, 645 (Mo.App.1998).

Second, the director should not be required to plead an offset that is contrary to her legal theory. Shelter's pleading is for a refund; the director's answer is that Shelter is not entitled to a refund. It makes no sense to require the director to plead—in the alternative and contrary to her legal theory—that if Shelter prevails, the state is entitled to an offset.[1] By requiring an alternative and inconsistent pleading, this Court allows Shelter to give its suppliers a tax exemption on the basis that the tax will be collected at retail and then seek a full refund of the taxes paid at retail by Shelter's employee-customers.

As a result, Shelter receives more than $110,000 in the form of a refund even though none of the tax money paid came out of Shelter's pocket. The state was entitled to $50,046 in tax; Shelter stipulated to that fact. The state has $110,053.97 and should be entitled to keep the $50,046 that Shelter agrees that it owes.

### 3. Refunds That Create Unjust Enrichments Should Be Avoided

Whether Shelter receives a refund of $110,053.97 or the $60,000 difference between what the director received and what Shelter owed, Shelter will receive a windfall. Its customers actually were charged for the amount of the tax.

Only in this rare situation is such a windfall acceptable. In a sense, and with the Court's help, Shelter will return the money to the customers because Shelter sells its food below cost and thereby operates the cafeteria at a loss.

In most situations, however, the vendor will pocket the refund, and its customers, who are the actual parties in interest because they were charged for the sales tax, will receive nothing.

Ever since the early common law, the principle of unjust enrichment has been constant: "Whenever one person has received money to which another person, in justice and good conscience, is entitled, the law creates or implies a promise by the former to pay it to the latter...." BENJAMIN J. SHIPMAN, HANDBOOK OF COMMON-LAW PLEADING 162 (3d ed.1923).

The factual situation in sales tax cases, where the seller receives a refund of amounts actually charged to its customers, would certainly be unjust enrichment.

---

1. Rules 55.06 and 55.10 allow a party to plead in the alternative but do not require a party to do so.

The seller receives a benefit at the expense of the customer. When this occurs, it seems that these customers may well bring a class action against the seller seeking restitution and requiring the vendor to hold any refund received in a constructive trust for the benefit of the customers. This remedy was granted by an Illinois court in *Cohon v. Oscar L. Paris Co.*, 17 Ill.App.2d 21, 149 N.E.2d 472 (1958).

In *Cohon*, customers brought a class action against a seller of wall-to-wall carpeting after the seller received a tax refund of more than $130,000 because the seller was found to not be subject to the retailers' occupation tax. *Id.* at 473. The court found that the tax money "in equity and good conscience" did not belong to the seller but to "customers who had paid it" and ordered the seller to hold the refund in the form of a constructive trust for the benefit of its customers. *Id.* at 475.

This Court's decision in *Cole v. Morris*, 409 S.W.2d 668 (Mo.1966), is instructive. There, an injured employee collected benefits from the second injury fund as a result of an auto accident while on the job. He subsequently recovered damages from a third-party tortfeasor. While the statutes did not recognize a subrogation right of the state treasurer, custodian of the second injury fund, to recover the money paid to the injured worker, this Court held that a constructive trust would be imposed in favor of the treasurer so that the employee would not be unjustly enriched by collecting money from two sources for the same injury. *Cole* thus holds that a constructive trust is warranted even though the person who was unjustly enriched did nothing wrong in a legal sense. *See* RESTATEMENT (FIRST) OF RESTITUTION sec. 160 (1937). *Cf. Straube v. Bowling Green Gas Co.*, 360 Mo. 132, 227 S.W.2d 666, 670–71 (1950).

A second option would be to prevent any future overpayment of taxes but deny the refund entirely unless the vendor first agrees to pass the refund along to its customers. With this option, the money would either remain with the state or be given to the tax-paying customers thereby eliminating any unjust enrichment. This option may be appropriate even though the statute authorizes only the vendor—the one obligated to remit the tax—to seek the refund. Section 144.190.[2]

Some state courts have denied refund requests from vendors because they did not pay the tax and, thus, were not the real parties in interest.[3] In *Cook v. Sears–Roebuck & Co.*, the Supreme Court of Arkansas denied Sears' request for a refund of taxes paid by customers because allowing such a refund would "disregard completely the entire doctrine against unjust enrichment." 212 Ark. 308, 206 S.W.2d 20, 22 (1947). The court noted that Sears

---

**2.** Missouri law provides that only the "person legally obligated to remit the tax" to the state meaning the seller and not the purchaser can seek a refund. Section 144.190; *Galamet, Inc. v. Director of Revenue*, 915 S.W.2d 331, 336 (Mo. banc 1996). While customers would lack standing on their own to request a refund, they should not be precluded from bringing an action against the seller for restitution where that seller has received a refund from the state.

**3.** Other states have legislation governing rights to such refunds. To prevent the seller from obtaining a windfall in the event he is unable or unwilling to locate the customer who actually paid the tax, New Jersey enacted a statute requiring persons seeking a refund to first prove they are the party who actually paid the tax. N.J.S.A. 54:32B–20 (2003); *Commercial Refrigeration & Fixture Co., Inc. v. Director*, 184 N.J.Super. 387, 2 N.J.Tax 415, 446 A.2d 210 (1981). Taking a slightly different approach, Minnesota's statute requires the vendor to either agree to refund the purchaser via crediting amounts due the vendor or returning the amount to the purchaser. M.S.A. 289A.50, subd. 2 (2002).

had no plans to return the money to its customers and was not entitled to a refund unless and until it could remove itself from the rule of unjust enrichment. On the basis of avoiding unjust enrichment, a Kentucky court refused to refund a sales tax of seven cents per quart of ice cream that the seller had collected from its customers. The seller sought a refund on the ground that the sales tax had been declared unconstitutional. *Shannon v. Hughes & Co.*, 270 Ky. 530, 109 S.W.2d 1174 (App.1937).

Similarly, even though the Missouri statute authorizes only the seller to seek a refund, this Court could deny refund—to avoid countenancing an unjust enrichment—unless the seller agrees to pass the money on to its customers. The ability to resolve the dispute in one case rather than two—one to grant the refund, and the second a class action to provide return of the tax money to the customers—makes this option more judicially economical.

That being said, I concur in allowing a windfall in this unusual situation. Shelter will receive a refund, but it operates the cafeteria at a loss for its employees' benefit. Shelter will keep a refund of money that did not actually come out of Shelter's pocket. There is an enrichment here, but it is not unjust because it appears that the refund will ultimately benefit the employee-customers, whose meals are subsidized.

**Conclusion**

I concur in the conclusion that Shelter's cafeteria is not a place in which meals are regularly served to the public. I dissent from requiring the director to refund to shelter the $50,046 that Shelter clearly owes on its purchases of food supplies for the cafeteria.

Sales tax refunds should benefit those who paid the money for the tax. In cases where a refund would result in a windfall to the seller, the director, the administrative hearing commission and this Court should not be in the business of facilitating unjust enrichment.

Refunds should not be given unless the seller agrees to refund those amounts to the customers who paid them. Where a seller prevails in an action for refund, the seller's costs in bringing the action should be passed along to its customers, in much the same fashion as members of a class pay attorney's fees from a common fund. *Jesser v. Mayfair Hotel, Inc.*, 360 S.W.2d 652, 661 (Mo. banc 1962). The seller, though not entitled to keep the refund, benefits from the case by the declaration that its sales in the future are not subject to sales tax. In some cases, where there are records of purchases, usually large purchases, the customers can be readily identified. In other cases, the seller should have a plan to benefit its future customers—the next-best class.

In any event, if the person obligated to remit the tax wants the money refunded—in addition to a declaration of the nonliability for sales tax—the person should be prepared to return the money to those who provided it rather than to expect to be unjustly enriched.