STATE of Missouri ex rel. WASHINGTON UNIVERSITY, Respondent,

v.

Jessica RICHARDSON, Appellant; Missouri Commission on Human Rights, Appellant.

Nos. WD 74907, WD 74993.

Missouri Court of Appeals, Western District.

Feb. 5, 2013.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 5, 2013.

Application for Transfer to Supreme Court Denied April 30, 2013.

Vanessa Ellis, St. Louis, MO, for appellant, MO, Commission.

John Lynn, St. Louis, MO, for appellant, Richardson.

Molly Han, St. Louis, MO, for respondent, Richardson.

Ian Cooper, St. Louis, MO, for respondent.

Katherine Nash, St. Louis, MO, for respondent.

Before: THOMAS H. NEWTON, P.J., JOSEPH M. ELLIS, and GARY D. WITT, JJ.

THOMAS H. NEWTON, Presiding Judge.

In a consolidated appeal, the Missouri Commission on Human Rights (MCHR) and Ms. Jessica Richardson appeal from the trial court's judgment and order in prohibition barring the MCHR from acting on Ms. Richardson's claims of sex discrimination against Washington University (the University) under the Missouri Human Rights Act (MHRA). We reverse and remand with direction to quash the writ of prohibition.

### Factual and Procedural Background

In June 2010, Ms. Richardson filed a complaint of discrimination with the MCHR against the University. The complaint stated that she enrolled in the University's Master of Fine Arts (MFA) program at the Sam Fox School of Design and Visual Arts (Fox School). Ms. Richardson alleged that she was sexually harassed and verbally abused by her advisor from January 2009 until she left the program without graduating, and that the University retaliated against her for reporting the advisor's conduct. She asserted that she sought assistance in November 2009 in a meeting with the Director of the Graduate School of Art at the University (Director), but the Director took no action. In December 2009, her advisor subsequently cancelled, and then rescheduled, her end of semester review without informing her of the date and time. When she failed to appear at the review, she was expelled from the MFA program.

Ms. Richardson stated she subsequently met with the Dean of the Fox School, who rescheduled the review. The Director placed Ms. Richardson on probation for the spring 2010 semester and assigned new advisors. Ms. Richardson alleged that she received contradictory information as to the expectations she was required to fulfill to finish her MFA, and that the Director informed her in May 2010 that she would not receive a final review and would not graduate with her class.

After the complaint was filed, the MCHR notified the University. The University petitioned the circuit court for a writ of prohibition, contending that the MCHR had no jurisdiction over Ms. Richardson's complaint because the University was not a place of public accommodation under the MHRA. The University requested that the MCHR be prohibited from taking further action, including barring it from issuing Ms. Richardson a right to sue letter. The trial court entered a preliminary order of prohibition, barring the MCHR from taking further action on Ms. Richardson's complaint. Ms. Richardson was granted leave to intervene. Both MCHR and Ms. Richardson moved to quash the preliminary writ and a hearing was held.

In a judgment on February 2, 2012, the trial court made its preliminary writ absolute. It determined that the MCHR did not have jurisdiction over Ms. Richardson's complaint because the MFA program was not a place of public accommodation. It further found that the MCHR had no authority to issue a right to sue letter and

ordered the MCHR to administratively close Ms. Richardson's complaint. Ms. Richardson and the MCHR appeal.

### Standard of Review

■ The "power to issue a writ of prohibition is limited to correction or limitation of an inferior court or agency that is acting without, or in excess of, its jurisdiction." *State ex rel. AG Processing Inc. v. Thompson,* 100 S.W.3d 915, 919 (Mo.App. W.D.2003). A party is not entitled to the issuance of a writ, and in each case, whether a writ should be issued is left to the court's discretion. *Id.* The court may issue a writ "when the facts and circumstances of a particular case demonstrate unequivocally that an extreme necessity for preventative action exists." *Id.* Consequently, we review the issuance of a writ of prohibition for abuse of discretion. *State ex rel. City of Jennings v. Riley,* 236 S.W.3d 630, 631 (Mo. banc 2007). The trial court abuses its discretion if it fails to follow the applicable statutes. *Id.* However, where "the foundation of the writ is based upon interpretation of a statute," our review of the statute's meaning is *de novo.* *Pitts v. Williams,* 315 S.W.3d 755, 759 (Mo.App. W.D.2010). We are mindful that a writ is an extraordinary remedy and it must be used "with great caution, forbearance, and only in cases of extreme necessity." *AG Processing Inc.,* 100 S.W.3d at 919.

### Legal Analysis

On appeal, Ms. Richardson raises one point, arguing that the trial court erred in granting the writ because the University is a place of public accommodation under the MHRA in that: (1) it receives public funds; and (2) it offers educational services to the public. The MCHR raises two points. In its first point, the MCHR ar-

gues that the trial court erred in granting a writ of prohibition because Missouri law holds it can issue a right-to-sue letter at any time during the administrative process of a case, and the scope of the MHRA is for the parties to litigate. In its second point, the MCHR argues that the trial court erred in finding the Fox School was not a place of public accommodation because the proper issue was whether the University was a place of public accommodation. For ease of discussion, we combine the parties' arguments where they overlap and discuss them out of order.

■ Section 213.065 [1] mandates that all "persons are entitled to the full and equal use and enjoyment of public accommodations within this state without discrimination." *Doe ex rel. Subia v. Kansas City, Mo. Sch. Dist.,* 372 S.W.3d 43, 47–48 (Mo. App. W.D.2012). The section makes it an unlawful practice

> for any person, directly or indirectly, to refuse, withhold from or deny any other person, or to attempt to refuse, withhold from or deny any other person, any of the accommodations, advantages, facilities, services, or privileges made available in any place of public accommodation … or to segregate or discriminate against any such person in the use thereof on the grounds of race, color, religion, national origin, sex, ancestry, or disability.

§ 213.065.2. Sections 213.010 and 213.065 define "place of public accommodation." 213.065.2. Subsection 213.010(15) provides in relevant part that "places of public accommodation" are:

> all places or businesses offering or holding out to the general public, goods, services, privileges, facilities, advantages or accommodations for the peace, com-

---

1. Statutory references are to RSMo 2000, unless otherwise indicated.

fort, health, welfare and safety of the general public or such public places providing food, shelter, recreation and amusement[.]

Subsection 213.010(15) then provides a non-exclusive list of examples of places, businesses, and other establishments that are places of public accommodation. *Subia*, 372 S.W.3d at 48. Subsection 213.065.3 excludes particular places from the ban on discrimination. Under subsection 213.065.3, a place is excluded if it is a:

> private club, a place of accommodation owned by or operated on behalf of a religious corporation, association or society, or other establishment which is not in fact open to the public, unless the facilities of such establishments are made available to the customers or patrons of a place of public accommodation as defined in section 213.010 and this section.

§ 213.065.3. At issue in this case is whether the University was a "place of public accommodation" under these sections.[2]

Our goal in interpreting statutes is "to ascertain the intent of the legislature, as expressed in the words of the statute, and that goal is achieved by giving the language used its plain and ordinary meaning." *City of Jennings*, 236 S.W.3d at 631 (internal quotation marks and citation omitted). We give meaning to "each word, clause, sentence, and section" and do not presume language used by the legislature to be superfluous. *Williams*, 315 S.W.3d at 759 (internal quotation marks and citation omitted). To determine the legislature's purpose we "do not read statutory provisions in isolation but, rather, we construe the provisions of a legislative act together and read a questioned phrase in harmony with the entire act." *Subia*, 372 S.W.3d at 47 (internal quotation marks and citation omitted).

■ The MHRA's prohibition against discrimination serves a remedial purpose: it is designed to be conducive to public welfare and the public good. *Id.* at 47. As such, it must be interpreted "liberally to include those cases which are within the spirit of the law and all reasonable doubts should be construed in favor of applicabili-

---

**2.** As noted, in its second point, the MCHR argues the trial court erred in finding the Fox School was not a place of public accommodation because the proper issue was whether the University was a place of public accommodation. The University argues that the trial court's analysis properly focused on the MFA program. We do not find these distinctions to be meaningful, nor are they supported by the statute itself.

Ms. Richardson's complaint was filed against the University and specifically alleged discrimination within the Fox School's MFA program. We see no logical reason that would require us to carve out a subset of the University (*i.e.* the Fox School or its MFA program) to analyze the University's treatment under the statute for the purposes of Ms. Richardson's complaint. Nor would we ignore that Ms. Richardson's allegations were based on her treatment specifically within the MFA program within the Fox School. In *Doe*

*ex rel. Subia v. Kansas City, Missouri School Dist.*, we likewise looked to the nature of public schools, and to the public school district, to determine whether the student's complaint of discrimination at Swinney Elementary School fell under the MHRA. 372 S.W.3d 43, 50 (Mo.App. W.D.2012). Moreover, section 213.010(15) provides that a place of public accommodation includes:

> (f) Any establishment which is physically located within the premises of any establishment otherwise covered by this section or within the premises of which is physically located any such covered establishment, and which holds itself out as serving patrons of such covered establishment;

Under this provision, an analysis of whether the MFA program or the Fox School is a place of public accommodation would necessarily also require an analysis of whether the University is a place of public accommodation.

ty to the case." *Id.* (internal quotation marks and citation omitted).[3]

### Supported in Whole or in Part by Public Funds

■ Ms. Richardson argues that the University is a public accommodation under subsection 213.010(15)(e) because it receives government funds. That subsection provides that "places of public accommodation" include:

(e) Any public facility owned, operated, or managed by or on behalf of this state or any agency or subdivision thereof, or any public corporation; *and any such facility* supported in whole or in part by public funds;

§ 213.010(15)(e) (emphasis added).

The plain language of the provision cannot support Ms. Richardson's argument. Subsection 213.010(15)(e) plainly states that a place of public accommodation includes (1) any public facility, (2) that is owned, operated, or managed by or on behalf of the state, a state agency, or a subdivision of the state, or by a public corporation, (3) *and any such facility* that receives public funds. It thus applies to (1) any public facility that is owned, oper-

ated, or managed under the auspices of the state or by any public corporation; and (2) any public facility that receives public funds. *See Subia,* 372 S.W.3d at 48 (applying the provision consistent with this interpretation).

Because a private university and its private graduate program are not public facilities, their receipt of public funds cannot bring them within this provision. Ms. Richardson argues that "[t]he basic idea behind Section 210.010(15)(e) is that public funds, to which all taxpayers of all races, genders and creeds contribute, should not be spent in any way that encourages or subsidizes discrimination against them." While her reading would seem in accord with the MHRA's policy goals, it is not supported by the legislature's language. The section does not state "any entity" or "any place" that receives public funds, but rather "any public facility."

Ms. Richardson contends that the end clause ("any such facility") cannot be read to refer back to the beginning clause, because "[t]he ending clause would be rendered empty and meaningless if it merely referred to governmental entities because they, by their very nature, receive public

---

**3.** Relying on *United Pharmacal v. Missouri Board of Pharmacy,* the University argues that we are to strictly construe the MHRA because there is a penalty provision and the " 'rule of lenity' applies to civil remedial statutes." *See* 208 S.W.3d 907, 913 (Mo. banc 2006). Under the rule of lenity, ambiguities in criminal laws are resolved against the government. *Id.* at 913. The University's reliance on *United Pharmacal* is misplaced. As the *United Pharmacal* court noted, the rule of lenity traditionally applies to criminal statutes. *Id.* The extension applied by *United Pharmacal* was for review of a declaratory judgment concerning a civil regulatory statute that carried felony consequences. *Id.* at 909, 913. *United Pharmacal* does not suggest we overrule the longstanding interpretation of the MHRA bar against discrimination as remedial in nature. *See Mo. Comm'n on Human Rights v. Red*

*Dragon Rest., Inc.,* 991 S.W.2d 161, 167 (Mo. App. W.D.1999) ("the statute is remedial and we must afford it a broad interpretation in order to accomplish the greatest public good" (internal quotation marks and citation omitted)). Nor do we believe the rule of lenity applies to interpreting whether an entity is within the MHRA merely because an entity may be required to compensate a plaintiff for her damages. *See id.* (discussing the reasons why the MHRA is considered remedial). Finally, although the University cites section 213.095, which provides the possibility of a misdemeanor charge for willfully violating an order of the MCHR, this provision does not bring the MHRA within the ambit of a rule for interpreting criminal statutes to protect the accused, nor is this provision even at issue here.

funds and are already covered by the beginning clause." We must disagree: the plain language shows the ending clause was meant to cover those public facilities not under control of the state or a public corporation, but which receive public funds.

### Offering or Holding Out to the General Public

Ms. Richardson further argues that the University is a place of public accommodation under subsection 213.010(15) because it includes "all places or businesses offering or holding out to the general public" and the University offers or holds out its services to the general public. To offer means:

> To bring to or before; to present for acceptance or rejection; to hold out or proffer; to make a proposal to; to exhibit something that may be taken or received or not.

BLACK'S LAW DICTIONARY 1081 (6th ed.1990). "Holding out" is shown by:

> advertising or soliciting by agents, or may result from a course of business or conduct, but essentially must be a public offering of the service that communicates that it is available to those who wish to use it.

Cook Tractor Co., Inc. v. Dir. of Revenue, 187 S.W.3d 870, 874 (Mo. banc 2006). It is not disputed that the University, the Fox School, and its MFA Program, invite the public to apply to their programs. Consequently, they "offer or hold out to the general public," by the plain language of the provision. Although the University argues that it does not "offer" or "hold out" because selective criteria are used for admission, we believe, contrary to the trial court's reasoning, that the University is describing the services delivered rather than offered.

### "Not in fact" Open to the Public

The trial court further found, and the University additionally argues, that even if the University is a place of public accommodation because it offers or holds out to the public, it is exempted from Ms. Richardson's claims by subsection 213.065(3), which in relevant part excludes a "private club, a place of accommodation owned by or operated on behalf of a religious corporation, association or society, or other establishment which is not in fact open to the public." (Emphasis added).

It is evident that the University, though a private institution, is not a private club, and is not owned or operated by a religious entity. Therefore, to determine if the exemption applies, we must ascertain the legislature's meaning in the phrase "not in fact open to the public." Without citation, the trial court determined that "[t]he General Assembly has consistently used the phrase open to the public' to mean accessible to all members of the public, rather than a small group or subset of persons." We do not agree. When called on to interpret the statutory meaning of "public," the Missouri Supreme Court has employed several criteria, but it has not adopted the limited meaning ascribed by the trial court, even in dealing with non-remedial statutes.

In J.B. Vending Co., Inc. v. Director of Revenue, our Supreme Court specifically addressed the meaning of the word "public." 54 S.W.3d 183, 186–90 (Mo. banc 2001). There the Administrative Hearing Commission (Commission) found that a food vendor was not liable for certain taxes because the relevant statute applied where meals or drinks were "regularly served to the public." Id. at 185. The vendor's sales were all inside of business facilities that had restricted access, admitting only employees or legitimate visitors through a receptionist or a guard. Id. at 185. The

Commission reasoned that because only those patrons who were permitted to enter the buildings could purchase from the vendor, the vendor did not serve "the people as a whole" and thus did not sell to the "public." *Id.* at 186.

Our supreme court reversed the Commission and specifically rejected an interpretation of the word "public" that meant "populace as a whole." *Id.* The court determined that the "public" includes a subset of the populace, and it rejected the argument that the existence of restrictions on who was able to access the vendor's sales meant the vendor did not serve the public. *Id.* at 187. The *J.B. Vending* Court further reasoned that to accept the interpretation of "public" adopted by the Commission would circumvent the legislature's purpose because any seller of food and drink could avoid the tax merely by placing restrictions on who could purchase its products. *Id.* at 188.

Subsequently, in *Shelter Mutual Insurance v. Director of Revenue,* our Supreme Court distinguished *J.B. Vending.* 107 S.W.3d 919, 921 (Mo. banc 2003). At issue there, as in *J.B. Vending,* was the tax on meals and drinks "regularly served to the public." *Id.* Shelter Mutual maintained a cafeteria within its office building for its employees and authorized visitors who were escorted by an employee. *Id.* at 920. The court cited two criteria to determine whether the meal services were provided to the "public": whether there was a special relationship between the vendor and the patron, and whether the vendor "invited the trade of the public." *Id.* at 921. It noted that *J.B. Vending* had interpreted "public" to include a subset of the public. *Id.* at 922. However, it distinguished the

facts before it from *J.B. Vending* because Shelter had a "special relationship" in that its patrons were employees, and it did not hold itself out to contract with the general public; thus, it did not regularly serve the public. *Id.* at 922–23.

Subsequently, in *Subia,* we directly addressed whether a public educational institution was a place of public accommodation as defined in the MHRA, and whether it was in fact open to the public.[4] 372 S.W.3d at 48. There an elementary school student sued the public school district under the MHRA, alleging that he had been sexually harassed and sexually assaulted by another student, and that despite knowing of the perpetrator's sexual tendencies, the school failed to take precautionary measures. *Id.* at 46.

We first determined that the school was a place of public accommodation under subsection 213.010(15)(e) (the public facility provision) because, consistent with the language in the provision, it was a "public facility ... owned, operated, or managed by a public school district, which is a subdivision of the state and a public corporation," as well as being supported by public funds. *Id.* at 48.

The school district, like the University here, argued that even if it was a place of public accommodation, it was exempted by subsection 213.065.3 because it was "not in fact open to the public." *Id.* at 48–49. The district contended it was not open to the public because enrollment to the school was restricted by age, residency, and other requirements, and the district restricted access to school buildings by the general public. *Id.* at 49. In accord with *J.B. Vending,* we found that "open to the public," included a subset of the public. *Id.* at

4. Our decision in *Subia* was published April 17, 2012, after the trial court's decision in this case, and was not available to offer the trial court guidance. *See* 372 S.W.3d 43. We and

the Missouri Supreme Court denied the Kansas City Missouri school district's requests for transfer. *See id.*

49–50. Moreover, the school district's interpretation ran afoul of legislative intent: "limiting the phrase open to the public' in Section 213.165.3 to mean accessible by *all* members of the populace would be contrary to the legislature's intent and would effectively nullify the prohibition against discrimination in public accommodations." *Id.* We further noted that the MHRA specifically sets forth places of public accommodation that have restrictions and limitations on who may have access—such as restaurants, resorts, and movie theaters—yet the statute nonetheless expressly defines them as public accommodations. *Id.* at 50; citing § 213.010(15)(a),(b),(c).

■ Under these cases, we find the exemption in subsection 213.065(3) inapplicable to the University and its programs. While admission to the MFA program and the University is restricted, its admittees are a subset of the general public that was invited to apply. Because admission is open to a subset of the general public, the University is "in fact open to the public." Moreover, to find that restrictions on admission exempted an entity from the MHRA would wholly circumvent the legislature's intent. As noted in *Subia*, under the University's interpretation, a movie theater that had age-restricted showings and a restaurant with a dress code or a reservations requirement would each be exempt from the MHRA under subsection 213.065.3, although the legislature plainly provided for their inclusion under subsection 213.010(15)(a)–(f).[5]

Clearly, the legislature sought to draw lines excluding some places from liability

as public accommodations under the MHRA—such as boarding houses occupied by the proprietor, subsection 213.010(15)(a), and churches, subsection 213.065(3)—to protect other interests such as personal privacy within the home and religious freedom. Those exemptions were specific, enumerated exclusions. In contrast, nowhere does the MHRA specifically make exception for academic institutions.

■ The MHRA is a remedial statute, which we construe broadly. *Red Dragon Restaurant, Inc.* 991 S.W.2d at 167. Under the University's argument, secular, private universities who hold themselves out by offering education to the general public, then selectively choose a subset of those applicants, would be immune from liability for discrimination under the MHRA. We cannot accept an interpretation of "open to the public" that so circumvents the legislature's purpose. Likewise, we cannot accept an interpretation that would allow any establishment to avoid the MHRA merely by instituting admissions criteria. On these facts, the MFA Program and the University are places of public accommodation under subsection 213.010(15) and are not exempted by subsection 213.065.3. Ms. Richardson's point is granted. The trial court abused its discretion in granting the writ barring the MCHR from processing Ms. Richardson's claim.

### MCHR's Issuance of a Right to Sue Letter

■ Finally, as future guidance to the court, we address the MCHR's first point.

---

**5.** The University further argues we should look to the "special relationship" criteria used by *Shelter Mutual Insurance v. Director of Revenue*, 107 S.W.3d 919, 921–22 (Mo. banc 2003). We do not find that criteria applicable here. There, the relationship was the pre-existing employment relationship between Shelter Mutual and the employees us-

ing its cafeteria, which occurred prior to any offer of services. *Id.* at 921–23. Our analysis is more appropriately guided by *Subia*, which specifically addressed the MHRA as a remedial statute and found it was guided by the analysis in *J.B. Vending Co., Inc. v. Dir. of Revenue*, 54 S.W.3d 183, 187 (Mo. banc 2001). 372 S.W.3d at 49–50.

There, the MCHR argues that the trial court erred in barring it from issuing a right to sue letter to Ms. Richardson because "the statutory scheme of the MHRA and Missouri case law mandates that MCHR can issue a right-to-sue letter at any time during the administrative process of a case, leaving the parties to litigate in circuit court the scope of the Missouri Human Rights Act."

▇▇▇▇▇ Prior to any suit in circuit court, a complainant under the MHRA is required to file a complaint with the MCHR in order to give the agency the opportunity to determine the validity of the claim, to investigate, and to determine if there is probable cause that discrimination has taken place. *See Igoe v. Dep't of Labor and Indus. Relations of State of Mo.*, 152 S.W.3d 284, 287 (Mo. banc 2005). If the Commission does not take action on the complaint, no inference is to be drawn as to the complaint's merits. *Id.* Section 213.111 mandates that the MCHR "shall issue" a right to sue letter at the complainant's written request when the MCHR has not completed its administrative processing within either a 180–day or 90–day timeframe. § 213.111.1.

▇▇▇▇▇ The letter terminates the agency proceedings and without the right to sue letter, the claimant cannot bring a MHRA claim in circuit court. *Pub. Sch. Ret. Sys. of Sch. Dist. of Kansas City v. Mo. Comm'n on Human Rights*, 188 S.W.3d 35, 44 (Mo.App. W.D.2006). Once the letter is issued, the MCHR can take no further action to pursue the complaint.

*State ex rel. Martin–Erb v. Mo. Comm'n on Human Rights*, 77 S.W.3d 600, 604 (Mo. banc 2002). Rather, once the letter is issued, "the complainant has the right to bring an action for damages or other relief" against the alleged discriminator. *State ex rel. Diehl v. O'Malley*, 95 S.W.3d 82, 90 (Mo. banc 2003).

Here, however, the circuit court removed Ms. Richardson's right to bring suit by ordering the MCHR to close her complaint without issuing a right to sue letter. Such a ruling is contrary to the statute.[6] "Section 213.111 clearly authorizes a separate civil action for damages that is not part of any administrative proceeding." *Id.* We agree with the MCHR that the trial court erred in barring it from issuing a right to sue letter at this preliminary stage.

### Conclusion

For the foregoing reasons, the trial court's judgment is reversed and remanded with directions to quash the writ of prohibition.

ELLIS and WITT, JJ. concur.

---

**6.** The University argues "[j]udicial review under Chapter 536 ensures that claimant's rights are protected without prematurely involving respondents in a lawsuit that may not even be cognizable under the statute." It erroneously relies on *State ex rel. Martin–Erb v. Mo. Comm'n on Human Rights*, 77 S.W.3d 600, 604 (Mo. banc 2002). There, the Missouri Supreme Court determined that *where* the MCHR itself determined it lacked jurisdiction, the claimant could pursue judicial review of the agency's decision in an action *against the agency* under the Missouri Administrative Procedures Act. 77 S.W.3d at 608 (citing section 536.150). The issue here, where the agency issued no decision, is not analogous.