Alok Ahuja, Judge
James Naugles is currently an inmate at the Western Reception, Diagnostic and Correctional Care Center in St. Joseph, a prison facility operated by the Department of Corrections. The Commission on Human Rights refused to investigate Naugles' complaint that the Department was discriminating against him on the basis of his disability by failing to provide handicap-accessible facilities at the prison. Naugles then filed a petition for a writ of mandamus in the Circuit Court of Cole County, to force the Commission to investigate his complaint. The court denied the writ, finding that the Commission lacked statutory authority over Naugles' claim because prisons are not "places of public accommodation" within the meaning of the Missouri Human Rights Act, § 213.010 et seq.[1] Naugles appeals. We affirm.
Factual Background
Naugles is presently in the custody of the Department of Corrections. On July 7, *50 2016, he was transferred to the Western Reception, Diagnostic and Correctional Care Center in St. Joseph. Naugles is paraplegic, and has had both of his feet amputated while he has been incarcerated. He is wheelchair-bound. Naugles alleged that the Correctional Center lacks handicap-accessible facilities for dining, worship, recreation, and education, and that he has accordingly been confined to the hospital wing of the facility, where he does not have access to the full range of services offered to able-bodied inmates. Prior to being transferred to St. Joseph, Naugles alleged that he was able to exercise and participate in daily activities at other Department facilities. Naugles alleged that, at the time his petition was filed, he had not been outdoors for almost a year. Naugles claimed that he and his attorney had made multiple requests to be transferred to a handicap-accessible facility, but that Department officials ignored those requests.
On December 15, 2016, Naugles filed an official Intake Questionnaire with the Commission on Human Rights, complaining that the Department of Corrections was discriminating against him based on his disability. On January 11, 2017, his attorney received a letter from the Commission, stating that the Commission "does not have jurisdiction over institutional situations or court issues."
Naugles filed a Petition for a Writ of Mandamus against the Commission and its Executive Director, Dr. Alisa Warren, seeking an order directing the respondents to investigate his complaints of disability-based discrimination. The circuit court issued preliminary orders in mandamus directing the respondents to answer the petition. Following respondents' filing of an answer, and briefing and argument by the parties on the merits of Naugles' petition, the circuit court entered its judgment denying Naugles relief. The court concluded that, as with private parties, the MHRA only provides a remedy for discrimination by State entities in employment, housing, or places of public accommodation. The court also concluded that "[p]risons are not places of public accommodation under the MHRA because the private nature of the prisons counteracts their public character."
Naugles appeals.
Jurisdiction and Standard of Review
"When a circuit court 'issues a preliminary order and a permanent writ later is denied, the proper remedy is an appeal.' " Curtis v. Mo. Democratic Party , 548 S.W.3d 909, 914 (Mo. banc 2018) (quoting State ex rel. Ashby Rd. Partners, LLC v. State Tax Comm'n , 297 S.W.3d 80, 83 (Mo. banc 2009) ); see also , e.g. , State ex rel. Robison v. Lindley-Myers , No. SC96719, 2018 WL 2927735, at *1 n.1 (Mo. banc June 12, 2018) ; U.S. Dep't of Veterans Affairs v. Boresi , 396 S.W.3d 356, 358 (Mo. banc 2013). In this case, the circuit court denied Naugles permanent relief based on its assessment of the merits of his claims, after issuing preliminary orders in mandamus to the respondents and receiving merits briefing. Naugles is accordingly entitled to appeal the circuit court's judgment.[2]
*51 Where an appeal is appropriate, "this Court 'reviews the denial of a petition for a writ of mandamus for an abuse of discretion.' " Curtis , 548 S.W.3d at 914 (quoting Boresi , 396 S.W.3d at 359 ). "An abuse of discretion 'occurs when the circuit court misapplies the applicable statutes.' " Id. (quoting Boresi , 396 S.W.3d at 359 ). "[W]here 'the foundation of the writ is based upon interpretation of a statute,' our review of the statute's meaning is de novo. " State ex rel. Washington Univ. v. Richardson , 396 S.W.3d 387, 391 (Mo. App. W.D. 2013) (citation omitted).
The primary goal of statutory interpretation is to give effect to legislative intent, which is most clearly evidenced by the plain text of the statute. The legislature is presumed to have intended every word, provision, sentence, and clause in a statute to be given effect. The plain and ordinary meaning of the words in a statute is determined from the words' usage in the context of the entire statute.
State ex rel. Goldsworthy v. Kanatzar , 543 S.W.3d 582, 585 (Mo. banc 2018) (citations omitted).
Analysis
I.
In his first Point, Naugles argues that the Commission has statutory authority to investigate his discrimination complaint because prisons are "places of public accommodation" within the meaning of the MHRA. We disagree.[3]
The MHRA created the Commission on Human Rights to "encourage fair treatment for and to foster mutual understanding and respect among, and to discourage discrimination against any racial, ethnic, religious or other group protected by this chapter, members of these groups or persons with disabilities." § 213.020.2. The Commission is authorized
[t]o receive, investigate, initiate, and pass upon complaints alleging discrimination in employment, housing or in places of public accommodations because of race, color, religion, national origin, ancestry, sex, age as it relates to employment, disability, or familial status as it relates to housing and to require the production for examination of any books, papers, records, or other materials relating to any matter under investigation....
§ 213.030.1(7).
Section 213.065 prohibits discrimination in "places of public accommodations." It provides:
1. All persons within the jurisdiction of the state of Missouri are free and equal and shall be entitled to the full and equal use and enjoyment within this state of any place of public accommodation, as hereinafter defined, without discrimination or segregation because of *52 race, color, religion, national origin, sex, ancestry, or disability.
2. It is an unlawful discriminatory practice for any person, directly or indirectly, to refuse, withhold from or deny any other person, or to attempt to refuse, withhold from or deny any other person, any of the accommodations, advantages, facilities, services, or privileges made available in any place of public accommodation, as defined in section 213.010 and this section, or to segregate or discriminate against any such person in the use thereof because of race, color, religion, national origin, sex, ancestry, or disability.
"Places of public accommodation" is defined in § 213.010(16) to mean:
all places or businesses offering or holding out to the general public, goods, services, privileges, facilities, advantages or accommodations for the peace, comfort, health, welfare and safety of the general public or such public places providing food, shelter, recreation and amusement, including, but not limited to:
....
(e) Any public facility owned, operated, or managed by or on behalf of this state or any agency or subdivision thereof, or any public corporation; and any such facility supported in whole or in part by public funds....
Although "places of public accommodation" is defined in § 213.010(16), § 213.065.3 recognizes an exception to the prohibition on discrimination in "places of public accommodation." Section 213.065.3 provides that the prohibition on public-accommodation discrimination
shall not apply to a private club, a place of accommodation owned by or operated on behalf of a religious corporation, association or society, or other establishment which is not in fact open to the public....
Missouri prisons plainly constitute "facilit[ies] ... operated ... by or on behalf of this state or any agency or subdivision thereof" within the meaning of § 213.010(16)(e). The question remains, however, whether they constitute "public facilit[ies]" operated by the State, and whether they are "not in fact open to the public " within the meaning of § 213.065.3. We agree with the circuit court that Missouri prisons are "not in fact open to the public," and are therefore not subject to the anti-discrimination provisions of §§ 213.065.1 and .2.
We interpreted the statutory exception for facilities which are "not in fact open to the public" in Doe ex rel. Subia v. Kansas City, Missouri School District , 372 S.W.3d 43 (Mo. App. W.D. 2012). In Subia , an elementary-school student alleged that a school district's failure to protect the student from sexual harassment and sexual assault in the school "constituted sex discrimination that deprived him of the full, free, and equal use and enjoyment of the School District's elementary school, a public accommodation." Id. at 46.
Subia held that the public elementary school was a "place of public accommodation," despite the fact that the school was only open to a subset of the public. Id. at 50. In reaching this conclusion, the Court relied heavily on the Missouri Supreme Court's decision in J.B. Vending Co. v. Director of Revenue , 54 S.W.3d 183, 184-85 (Mo. banc 2001). J.B. Vending held that the operator of vending machines and cafeterias in restricted-access business facilities was subject to state sales tax because the cafeterias and vending machines were facilities in which "meals ... are regularly served to the public" under § 144.020.1(6). See Subia , 372 S.W.3d at 49. The J.B. Vending decision emphasized that the food *53 vendor did not restrict those who could patronize its facilities; instead, "[a]nyone who had gained entry into one of the thirteen buildings in which J.B. operated was able to eat in J.B.'s cafeteria in that building." 54 S.W.3d at 185. The Court emphasized that J.B. Vending "holds itself out to serve those members of the public who come into its establishment, and the fact that some third party limits those who are able to reach that establishment does not mean that J.B. does not serve meals and drinks to the public. It does." Id. at 187, quoted in Subia , 372 S.W.3d at 49.
Besides its reliance on J.B. Vending , Subia also noted that the school at issue "holds itself out as a facility that provides" the free public education guaranteed to all state residents by Article IX, § 1(a) of the Missouri Constitution. Subia , 372 S.W.3d at 50.
We followed Subia in State ex rel. Washington University v. Richardson , 396 S.W.3d 387 (Mo. App. W.D. 2013), which held that a private university was a "place of public accommodation," despite the fact that its educational programs were only available to admitted students, because, "[w]hile admission to the [Master of Fine Arts] program and the University is restricted, its admittees are a subset of the general public that was invited to apply." Id. at 396.
This case is distinguishable from Subia and Washington University . The Department of Corrections does not hold itself out to the public, and does not invite members of the public to seek out the services it offers. In addition, the Department of Corrections is importantly different from the food vendor in J.B. Vending . This is made clear by Shelter Mutual Insurance Co. v. Director of Revenue , 107 S.W.3d 919 (Mo. banc 2003), a later sales-tax case which distinguished J.B. Vending . Shelter Mutual held that an employer-operated cafeteria was not a place in which "meals ... are regularly served to the public" when the cafeteria only served employees (and authorized visitors escorted by employees), in a building to which the employer had itself restricted access. Shelter Mutual emphasized that the employer-operated cafeteria was not "public" because all of the patrons of the cafeteria were in a "special relationship" (i.e. , an employment relationship) with the employer-operator; and because the employer-operator "does not invite the trade of the public" in its company cafeteria. Id. at 922-23.[4]
Like the employer in Shelter Mutual , the Department of Corrections has a "special"-and arguably unique-relationship with the individuals it houses in its prisons. The inmates in the Department's prisons are involuntarily confined in those facilities, based on a judicial determination of their guilt for criminal offenses in violation of Missouri law. The Department has been ordered to confine those individuals for a specified period of time as a form of punishment, and to rehabilitate the inmates so that they can safely reenter society. A prison's inmates are not members of the general public, or even members of a subset of the general public, who have voluntarily chosen to patronize the Department's facilities. Notably, the Department provides housing only to persons with whom it has this special relationship.
In addition, the Department does not "invite the trade of the public" in any *54 meaningful sense. To the contrary, a Missouri statute expressly provides that, with limited exceptions, "no person shall be permitted to enter a correctional center except by special permission of the chief administrative officer of the facility, the division director, the department director or under such regulations as they shall prescribe." § 217.265.1. While the existence of the Department's prisons may be publicly available information, the Department does not "invite" anyone to enter those facilities.
If anything, prisons are properly viewed as the antithesis of a "place of public accommodation." Prisons are designed to separate and isolate offenders from the public, for the protection of the public; they are not "public facilit[ies]" within the meaning of the MHRA. As the Supreme Court of the United States emphasized when holding that the government could constitutionally impose restrictions on prison visitors,
[t]he very object of imprisonment is confinement. Many of the liberties and privileges enjoyed by other citizens must be surrendered by the prisoner. An inmate does not retain rights inconsistent with proper incarceration. And ... freedom of association is among the rights least compatible with incarceration. Some curtailment of that freedom must be expected in the prison context.
Overton v. Bazzetta , 539 U.S. 126, 131, 123 S.Ct. 2162, 156 L.Ed.2d 162 (2003) (citations omitted).
Numerous state and federal courts in other jurisdictions have reached the same conclusion: prisons are not "places of public accommodation" within the meaning of various federal and state anti-discrimination statutes.[5] Indeed, we are unaware of any decision of a court in the United States holding that prisons are "places of public accommodation," and Naugles' counsel conceded at oral argument that she was aware of none.
Naugles relies on Pennsylvania Department of Corrections v. Yeskey , 524 U.S. 206, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998), and on Department of Corrections v. Human Rights Commission , 181 Vt. 225, 917 A.2d 451 (2006), to argue that the Correctional Center should be considered a "place of public accommodation." But those cases are clearly distinguishable.
In Yeskey , "[t]he question before [the Court was] whether Title II of the Americans with Disabilities Act of 1990 (ADA), which prohibits a 'public entity' from discriminating against a 'qualified individual with a disability' on account of that individual's disability, covers inmates in state prisons." 524 U.S. at 208, 118 S.Ct. 1952 (citations omitted). The Court answered that question by stating that "[s]tate prisons fall squarely within the statutory definition of 'public entity,' which includes 'any department, agency, special purpose district, *55 or other instrumentality of a State or States or local government.' " Id. at 210, 118 S.Ct. 1952 (quoting 42 U.S.C. § 12131(1)(B) ). The question in this case is not, however, whether the Department of Corrections is a "public entity" (which it plainly appears to be), but instead whether the Correctional Center in which Naugles is housed is a "place of public accommodation." As we have explained above, the "public accommodation" question is not answered simply by the fact that the facility is operated by a State agency. Yeskey does not address the question we face here.
The Vermont Department of Corrections case is distinguishable for similar reasons. In that case, the Vermont Supreme Court held that its anti-discrimination statute was "intended to make all governmental entities subject to the public accommodations law," regardless of the use of particular facilities operated by those governmental entities. 917 A.2d at 459 ¶ 25. The Court reached this conclusion following an exhaustive review of the legislative history of Vermont's anti-discrimination statutes. See id. at 455-57, ¶¶ 13-18. Based on that review, the Court concluded that "the [statutory] definition of a 'place of public accommodation' is more useful for determining jurisdiction over private entities than it is for determining which governmental entities are public. Government is public." Id. at 459 ¶ 23. The Vermont Supreme Court's analysis is inapplicable to the MHRA. As explained above, our statute quite clearly does not extend the prohibition on public-accommodation discrimination to all facilities operated by State agencies; the question raised by Naugles cannot be resolved merely by observing that the Department of Corrections is a public entity.
The Department of Corrections' prison facilities are "not in fact open to the public," § 213.065.3, and those facilities are therefore not subject to the MHRA's prohibition of discrimination in "places of public accommodation." Naugles' first Point is denied.
II.
In his second Point, Naugles argues that, whether or not the Correctional Center is a "place of public accommodation," the State is prohibited from discriminating against him on the basis of his disability by virtue of § 213.070.1(3). We disagree.
Section 213.070 provides in relevant part that
1. It shall be an unlawful discriminatory practice for an employer, employment agency, labor organization, or place of public accommodation:
....
(3) For the state or any political subdivision of this state to discriminate on the basis of race, color, religion, national origin, sex, ancestry, age, as it relates to employment, disability, or familial status as it relates to housing....
While the MHRA only prohibits discrimination by private parties in three specific spheres of activity (employment, housing, and places of public accommodation), Naugles argues that § 213.070.1(3) prohibits the State from discriminating against the enumerated protected classes in any activity.
We cannot agree that § 213.070.1(3) imposes a broader anti-discrimination mandate on State entities than the MHRA applies to private parties.[6] The entire structure of the MHRA makes clear that the statute is intended to prohibit, and provide a remedy for, discrimination *56 in three specific domains: housing (see §§ 213.040, 213.045, and 213.050); employment (see § 213.055); and public accommodations (see § 213.065).[7] The statute explicitly provides that the Commission's investigative authority-the authority which Naugles seeks to compel the Commission to exercise-is limited to "complaints alleging discrimination in employment, housing or in places of public accommodations." § 213.030.1(7).
The fact that the MHRA is only intended to address-and redress-discrimination in employment, housing, and public accommodations is also made clear by the statutory provisions governing right to sue letters. The Commission's issuance of a right to sue letter is a precondition to the filing of an MHRA claim in the circuit court. Farrow v. St. Francis Med. Ctr. , 407 S.W.3d 579, 591 (Mo. banc 2013). "[W]ithout the right to sue letter, the claimant cannot bring a MHRA claim in circuit court." Washington Univ. , 396 S.W.3d at 397 (citing Pub. Sch. Ret. Sys. of Sch. Dist. of Kansas City v. Mo. Comm'n on Human Rights , 188 S.W.3d 35, 44 (Mo. App. W.D. 2006) ).
The statute governing the issuance of right to sue letters, § 213.111.1, makes clear that right to sue letters may only be issued-even with respect to claims founded on § 213.070.1(3)-with regard to alleged discrimination in employment, housing, and public accommodations. The first two sentences of § 213.111.1 provide:
If, after one hundred eighty days from the filing of a complaint alleging an unlawful discriminatory practice pursuant to section 213.055, 213.065 or 213.070 to the extent that the alleged violation of section 213.070 relates to or involves a violation of section 213.055 or 213.065, or subdivision (3) of subsection 1 of section 213.070 as it relates to employment and public accommodations, the commission has not completed its administrative processing and the person aggrieved so requests in writing, the commission shall issue to the person claiming to be aggrieved a letter indicating his or her right to bring a civil action within ninety days of such notice against the respondent named in the complaint. If, after the filing of a complaint pursuant to sections 213.040, 213.045, 213.050 and 213.070, to the extent that the alleged violation of section 213.070 relates to or involves a violation of sections 213.040, 213.045 and 213.050, or subdivision (3) of subsection 1 of section 213.070 as it relates to housing, and the person aggrieved so requests in writing, the commission shall issue to the person claiming to be aggrieved a letter indicating his or her right to bring a civil action within ninety days of such notice against the respondent named in the complaint.
The quoted language contemplates that right to sue letters will be issued with respect to alleged violations of § 213.070.1(3) only if the underlying complaints relate to violations of § 213.055 (employment), § 213.065 (public accommodations), or §§ 213.040, 213.045, or 213.050 (housing). The statute does not contemplate issuance of a right to sue letter alleging a violation of § 213.070.1(3) unless the complaint relates to employment, housing, or public accommodations, and therefore a complaining party would not have the ability to file a circuit court lawsuit invoking *57 § 213.070.1(3) unless it relates to one of those three spheres of activity. Thus, § 213.111.1 provides additional confirmation that § 213.070.1(3) does not extend the anti-discrimination mandate for State agencies beyond employment, housing, and public accommodations.[8]
Naugles' second Point is denied.
Conclusion
The judgment of the circuit court, which denied Naugles' petition for writ of mandamus, is affirmed.
All concur.

Statutory citations refer to the 2016 edition of the Revised Statutes of Missouri, updated by the 2017 Supplement.

After discussing the substantive merits of Naugles' claim and concluding that "[p]risons are not places of public accommodation under the MHRA," the circuit court's judgment concludes by stating that "[t]his Court denies the Relator's Preliminary Writ of Mandamus and finds in favor of the Respondents." (Emphasis added.) Despite the wording of the circuit court's judgment, it is clear that the court issued Preliminary Orders in Mandamus, signed by the judge, to each of the respondents at the outset of the action; those preliminary orders were the only process served on respondents, requiring them to appear and defend. The circuit court's final judgment therefore had the effect of denying Naugles permanent relief. This case accordingly does not involve a situation like the one in Riley v. City Administrator of City of Liberty , No. WD81077, 552 S.W.3d 764, 2018 WL 3026896 (Mo. App. W.D. June 19, 2018), in which we dismissed an appeal where the circuit court issued a summons rather than a preliminary order at the outset of the action, and made clear in its final judgment that the court intended to deny a preliminary order in mandamus (albeit following substantial merits briefing).

In this litigation Naugles has not sought to distinguish between different areas within the prison. Instead, he has broadly argued that the entirety of the Correctional Center constitutes a "place of public accommodation." Given the nature of Naugles' argument, we have no occasion to consider whether particular areas within the Correctional Center (such as areas open to visitors) could be considered "places of public accommodation."

The importance of a vendor's "special relationship" with its patrons was recognized in J.B. Vending itself, which emphasized that "the persons [J.B.] sells meals and drinks to are, in effect, strangers; they are just those members of the public whom the building owners allow in the building. They have no contractual or other special relationship with J.B." J.B. Vending , 54 S.W.3d at 189.

Thus, the following courts held that prisons are not "public accommodations" under their respective state civil rights laws: Comm'n on Human Rights exrel. Vargas v. State Dep't of Correction , No. HHBCV136019521S, 2014 WL 564478 (Conn. Super. Jan. 10, 2014) ; Livingston v. Beeman , 408 S.W.3d 566, 581 (Tex. App. 2013) ; Napier v. State , No. CV-00-042, 2002 WL 32068249, at *6-*8 (Me. Super. Nov. 18, 2002) ; Skaff v. W. Va. Human Rights Comm'n , 191 W.Va. 161, 444 S.E.2d 39, 41-42 (1994) ; Blizzard v. Floyd , 149 Pa.Cmwlth. 503, 613 A.2d 619, 621 (1992) ; Roufa v. Constantine , No. C15-1379JLR, 2017 WL 120601, at *12-*13 (W.D. Wash. Jan. 11, 2017). Similarly, courts have held that prisons are not "public accommodations" under Title III of the federal American with Disabilities Act. See White v. Secor, Inc. , No. 7:10-CV-00428, 2010 WL 4630320, at *2 (W.D. Va. Nov. 5, 2010) ; Edison v. Douberley , No. 2:05-CV-307-FtM-29SPC, 2008 WL 4194813, at *4 (M.D. Fla. Sept. 9, 2008), aff'd , 604 F.3d 1307 (11th Cir. 2010).

We assume, without deciding, that § 213.070.1(3) has the effect of waiving the State's sovereign immunity with respect to claims of discrimination in places of public accommodation. All we hold in this opinion is that § 213.070.1(3) does not extend the State's liability to discrimination independent of its liability (if any) for discrimination in employment, housing, or public accommodations.

Naugles has not argued that his discrimination complaint alleged housing discrimination under the MHRA. Speaking generally, the housing-related provisions of the statute prohibit discrimination in connection with the sale or rental of housing (§§ 213.040, 213.050), and in real estate-related financing (§ 213.045).

Naugles also argues that the title of § 213.070-"Additional unlawful discriminatory practices"-demonstrates that § 213.070(3) extends the State's liability for discrimination beyond the three areas of employment, housing, and public accommodations. It is well established in Missouri law, however, that " 'giving effect to chapter, article or section headings is not appropriate because they are merely arbitrary designations inserted for convenience of reference by clerks or revisors, who have no legislative authority, and are therefore powerless to lessen or expand the letter or meaning of the law.' " State v. Baldwin , 484 S.W.3d 894, 898 (Mo. App. W.D. 2016) (quoting Gurley v. Mo. Bd. of Private Investigator Examiners , 361 S.W.3d 406, 413 (Mo. banc 2012) ); see also , e.g. , Estate of Heil v. Heil , 538 S.W.3d 382, 387 n.4 (Mo. App. W.D. 2018).